## Schwartz *v.* Keystone Oil Co.    Commercial Bank's Appeal.

[Marked to be reported.]

*Receivers—Compensation for services.*

In ascertaining the proper compensation for the services of a receiver, the considerations that should be controlling with the court are the time and labor needed, not necessarily the time and labor expended in the proper performance of the duties imposed; the fair value of such time and labor measured by the common business standard; the degree of activity, integrity and dispatch with which the work of the receivership is conducted. When there has been delay in closing up his accounts, inattention to his trust, use of the trust fund by the receiver in his own private business, or a want in any particular of the good faith and integrity that a court of equity uniformly requires of all its agents and officers, the compensation may be reduced below the ordinary standard or denied altogether as justice and right may require.

*Allowance for receiver's expenses.*

Allowance for receiver's expenses are not a matter of course, but should be carefully scrutinized by a chancellor. If a man of ordinary business capacity and prudence in the conduct of his own business would not have paid the same salaries of his employees, or surrounded himself with the same array of professional advisers at the same cost and adopted the same general line of management, as the receiver did in managing the business intrusted to him, the receiver's bills should be reduced so as to bring them within proper limits.

*Investment of funds in receiver's hands.*

Where a receiver has funds in his hands, which cannot be distributed for a considerable period, it is his duty to ask leave of the court to invest the funds, and to try in good faith to keep them invested for the benefit of the owner. If he mingles the trust funds with his own, and deposits them in his own name in a bank owned by himself, and makes profit by their use in the bank, he will be surcharged for their use.

A receiver was appointed in November, 1887. Between the date of his appointment and June 14, 1888, the property in his hands was sold, and the estate substantially converted into money. On January 30, 1890, he filed his first account, but only after being ruled to do so. He filed his final account in June, 1891. He deposited the fund to his own individual credit in his own individual bank so that it was indistinguishable from his private funds. He however directed his bank clerks to be ready at all times to pay the money over, if called upon for it. *Held*, that he should be surcharged for the use of the money.

*Salary of receiver.*

In the above case, involving an estate of some $96,000, the work was nearly all done in the first six months by a superintendent and clerks who were employed to conduct it under the general direction of a receiver, who gave only a portion of his time to the work. Compensation for the assistants was claimed and allowed. The receiver claimed for his own service $11,366.66. *Held*, that a salary of $3,000 for the first year, and the further sum of $1,000 for subsequent services, was sufficient.

Argued Oct. 6, 1892. Appeal, No. 177, Oct. T., 1892, by Commercial Bank of Titusville et al., from decree of C. P. Venango Co., Nov. T., 1887, No. 4, dismissing exceptions to account of R. G. Lamberton, receiver. Before PAXSON, C. J., STERRETT, WILLIAMS, MCCOLLUM and MITCHELL, JJ.

Audit of receiver's account.

Exceptions to the account, by appellants, as creditors, objected to the receiver's compensation and counsel fees and claimed a surcharge for interest. The account was referred to C. A. Myers, Esq., as auditor, from whose report the facts appear as stated in the opinion of the Supreme Court. Excep-

tions were filed by appellants to the auditor's allowance, inter alia, of compensation and counsel fees, and refusal to surcharge interest. The exceptions were overruled and a decree entered by the court, TAYLOR, P. J., allowing the credits claimed by the receiver.

The litigation in Titusville Iron Works v. Keystone Oil Co., 122 Pa. 627; Same v. Same, 130 Pa. 211; Kerstetter's Ap., 149 Pa. 148, and the Manufacturer's Gas Co.'s Ap., 149 Pa. 147, arose out of the property in the receiver's hands in this case.

*Errors assigned* were, inter alia, dismissal of exceptions, quoting them.

*Roger Sherman, Samuel Grumbine* with him, for appellants.—Compensation properly allowable to a receiver is measured by time necessarily employed, the responsibility incurred growing out of the nature of the business, and the amount of money received by him: Beach on Receivers, §§ 1, 312, 755, 756; Hill on Trustees, 575; Utica Ins. Co. v. Lynch, 2 Barb. Ch. 573; Atty. Gen. v. N. A. Life Ins. Co., 91 N. Y. 57; Apple's Est., 2 Phila. 239; Bird's Estate, 2 Parsons, 168; Barton's Est., 1 Parsons, 24. The mingling of trust funds with his own by a trustee; his neglect to invest money in his hands pending protracted litigation; resisting efforts made for orders of court requiring him to invest; failing to account for interest and profits of the use of trust fund; causing needless delay in the distribution of money; failure to account until compelled by order of the court; constitute, each of them, malfeasance: Robinson's Est., 2 Phila. 340; Witmer's Ap., 87 Pa. 123; Hess's Est., 68 Pa. 454; Wistar's Ap., 54 Pa. 60.

A receiver of an insolvent corporation, being a trustee as to creditors and stockholders, is forbidden by law to make any profit by the use of the trust fund or property for his private benefit: Perry on Trusts, § 428; Hill on Trustees, 535; McCausland's Ap., 38 Pa. 466–470; Stearly's Ap., 38 Pa. 525.

*E. H. Lamberton,* for appellee.—Compensation of a trustee, though usually awarded in the form of commissions, is not determinable by any established practice or rule, being graduated to responsibility incurred, the amount of the estate and labor expended. It may be awarded even in a gross sum according

to the common practice in this country: Harland's Account, 5 Rawle, 330, 333, 334; Stevenson's Est., 4 Whart. 98; McElhenny's Ap., 46 Pa. 347.

A reasonable degree of vigilance and the exercise of good faith is the standard of the trustee's duty: Fahnestock's Ap., 104 Pa. 46–52; Calhoun's Est., 6 Watts, 189; Neff's Ap., 57 Pa. 96; Boone, Corporations, §§ 74, 175; Trickett on Assignments, 139.

The finding of an auditor upon the facts, which has been approved by the court below, will not be disturbed on appeal, except for flagrant error: Burrough's Ap., 26 Pa. 264; Dellinger's Ap., 71 Pa. 425.

A receiver is not chargeable with interest when the fund has been locked up in his hands and he is not shown to have used the same: Wallace's Ap., 3 W. N. 468.

*J. H. Osmer*, for receiver.—The Supreme Court will not go over the evidence to correct matters of fact found by an auditor and approved by the court below, except it be an extreme case—one of clear error: M'Carthy's Ap., 14 Atl. R. 356; Lewis's Ap., 127 Pa. 127; Logue's Ap., 104 Pa. 136; Bedell's Ap., 87 Pa. 510.

OPINION BY MR. JUSTICE WILLIAMS, January 30, 1893:

The actual appellee in this case is the receiver, since all the questions raised relate to his duties and his compensation. Before entering upon any of these questions, this case seems to require a restatement of some venerable elementary principles applicable to such officers that ought never to be lost sight of. A receiver is the officer, the executive hand, of a court of equity. His duty is to protect and preserve, for the benefit of the persons ultimately entitled to it, an estate over which the court has found it necessary to extend its care. He occupies a fiduciary relation to the owners of the property under his care and to all who have claims upon it. He is subject in all things to the direction and control of the court whose officer he is, and when in doubt about his duty in any particular it is his privilege to apply to the court for specific instructions. His compensation is not regulated in this state by statute, but must be settled by the chancellor who appointed him and has jurisdiction of his accounts. The amount of his compensation does not depend

on his wealth or social standing, or the demands made upon his time by private business; nor yet upon the estimates that gentlemen who are themselves in receipt of an ample income may put upon his services from the standpoint they occupy. The considerations that should be controlling with the court are the time and labor needed, not necessarily the time and labor expended, in the proper performance of the duties imposed; the fair value of such time and labor measured by the common business standards; the degree of activity, integrity and despatch with which the work of the receivership is conducted. When there has been delay in closing up his accounts, inattention to his trust, use of the trust fund by the receiver in his own private business, or a want in any particular of the good faith and integrity that a court of equity uniformly requires of all its agents and officers, the compensation may be reduced below the ordinary standard or denied altogether, as justice and right may require. In support of these general principles it seems altogether unnecessary to refer to authorities as they will be found stated in the most familiar text books: Brightly, Eq. Jurisprudence, 884; Kerr on Receivers, 209; Pomeroy's Equity, 1336. Allowances for expenses are not a matter of course. Such bills should be carefully scrutinized by a chancellor. If they are unnecessary or extravagant expenditures they should be reduced or disallowed altogether. The same is true of bills for the employment of counsel and the expenses incident to the conduct of litigation. A receiver is appointed not to plunder or dissipate an estate, but to preserve it, and in passing upon bills the question which should control their allowance is " would a man of ordinary business capacity and prudence in the conduct of his own business be likely to incur the same expenses or enter upon the same course of conduct? " In other words, would he have paid the same salaries to his employees, surrounded himself with the same array of professional advisers at the same cost, and adopted the same general line of management if he had been transacting his own business? If not, his bills should be reduced so as to bring them within proper limits. He is a trustee, and bound as such to the exercise of prudence and good faith in all his dealings with the trust estate, and to bring to the discharge of his official duties the same measure of skill and the same personal supervision that he would give if the estate was his own.

In the light of these familiar principles we proceed to consider the questions raised on this record, not in the order in which they are presented by the assignments of error, but in their natural order. ' First. What was the nature of the trust committed to the receiver in this case? It was to take possession of the property of the Keystone Oil Company, preserve it and convert it into money, as the hand of the court appointing him, so that distribution might be made as speedily as practicable among those entitled to the fund. This made it necessary to make prompt collections of outstanding bills, to convert the assets into money as soon as it could be done without loss, to adjust the claims of creditors where this was practicable, and to facilitate distribution of the fund. If delay in distribution was unavoidable, then the receiver should have paid the money raised into court or invested it at interest under the order of the court for the benefit of those to whom it should be awarded.

Second. What duties did the acceptance of the trust impose upon the receiver? Among others was the duty to give his personal attention and supervision to the conduct of the trust estate. He could employ superintendents and clerks when such assistance was necessary. He might secure legal advice and assistance to guide him in the proper performance of his duties. He might go into court when in doubt and ask instructions as to his powers and duties. But if he employed unnecessary help, incurred unnecessary expenses, or entered upon unnecessary litigation, he should be charged, and not the fund, with the expenses so incurred.

Again, it was the duty of the receiver to keep the trust funds separate from his own. He had no right to mingle them. In depositing them in bank he should have made sure that they were placed to his credit as receiver, for it was in that capacity alone that he was entitled to their custody, and they were at all times subject to the order of the court in whose hands, in contemplation of law, the fund actually was.

If he found himself with such a sum on hand, as if it had been his own he would have invested, it was his duty to ask leave of the court to invest it, and to try, in good faith, to keep it invested for the benefit of the owners. When the assets were turned into money it was his duty to make out his account and submit the fund to the direction of the court.

Third. How were the duties of the trust performed by the appellee? He was appointed on the 3d day of November, 1887. Between that date and the 14th day of June, 1888, the property of the Keystone Oil Company was sold and the estate substantially converted into money. More that eighteen months later, on the 30th day of January, 1890, he filed his first account, but not until after he had been ruled to do so. After another eighteen months he filed his final account in June, 1891, more than three and one half years after his appointment. Meantime the fund had been under his control and practically in his hands for over three years. He does not seem to have ever deposited it to the credit of the court, or himself as receiver, but to his own individual credit and in his own individual bank, so that it was mingled with and indistinguishable from his private funds. The auditor finds this fact, but strangely enough reports, as a conclusion of law, that this gross violation of duty was atoned for in a court of equity by the oral direction given to his bank clerks to be ready at all times to pay the money over, if called upon for it. But as it was deposited to his own individual credit no one could call for it but himself. The direction therefore meant nothing. The conclusion of the auditor has absolutely nothing on which to stand, and is in violation of one of the familiar principles to which we have already referred. The plain fact is that for three years this large sum of trust money was mingled with the private funds of the receiver and used by the bank which he owned, as other deposits were used, in making loans to customers at the usual rate of discount.

Another item that deserves attention is that in preparing his account he has improperly increased the total sum of his debits and credits by putting upon both sides of the accounts of the trust estate an item of $45,038.91, the price of a pipe line that belonged to Smithman and formed no part of the estate of the Keystone Oil Company. He sold the pipe line with the refinery, but he sold it not as a receiver but as the agent of Smithman under a written power, as follows: " I will authorize and empower you in my place and name to offer the said pipe line for sale, and sell the same in connection with the refinery; and upon payment of the said sum $45,038.91 to me or the giving of satisfactory security therefor, I will convey the said

pipe line to the purchaser." Under this authority he sold the pipe line with the refinery, and at once paid the agreed price to Smithman as the owner. Striking out this item which has no business in the account, the total of the receipts by the receiver is $96,181.74.

We come now to the expenses of collecting this fund. They are stated thus:

| | |
|---|---|
| For attorney's fees     .     .     .     .     . | $4,685 56 |
| Superintendent and clerk hire   .     .     . | 2,002 74 |
| Compensation of receiver   .     .     .     . | 11,366 66 |
| Total     .     .     .     .     . | $18,054 96 |

This is nearly twenty per cent upon the amount raised. It is sincerely to be hoped that the records of the courts of equity in this state present few parallels to this exhibit.

It would afford some relief to the chancellor if it appeared that this fund, collected at such an enormous cost, had been promptly invested and kept at interest for the benefit of its unfortunate owners. But as we have already seen, this was not done. On the contrary an offer made by a bank in good credit to borrow $50,000 of the fund at five per cent interest, accompanied by an offer of ample outside security was resisted by him and at last defeated.

Such being the manner in which the duties imposed by this trust have been performed in some important particulars, it remains to inquire, finally, what compensation should be allowed the receiver? Compensation is made by one of two methods; either a reasonable commission is allowed on the fund, or a fair price for the labor and time employed in its collection. In some states the rate of commission that may be allowed to trustees is fixed by statute. In others it is regulated by the courts. The New York rule has been to allow five per cent on the first one thousand dollars, two and one half per cent on the next four thousand, and one per cent on all sums above five thousand. In this state the rule is more flexible. The usual allowance ranges from two to five per cent, while in exceptional cases commissions as high as ten per cent, and possibly even higher than that, have been allowed.

Where compensation is charged for labor and expenses, instead of a commission on the fund, some statement of the time

spent and labor done should be furnished, by which the reasonableness of the charge made may be determined. No such account is furnished in this case. The work was mainly done in the first six months, during which time superintendents and clerks were employed to conduct it under the general direction of the receiver. Only part of his own time was given during this six months to the receivership. It would be helpful if we knew how much, but he has not chosen to inform us. The auditor seems to have had no trouble with this question, for in a comprehensive finding of fact he affirms " that the services performed by the receiver were worth the amount charged and for which he has claimed credit in his account, and should be allowed unless as a law proposition he is not entitled to that sum." This was followed by an equally comprehensive finding of law in which he declares that there is no " law proposition" to interfere with the allowance, and he accordingly awards him the sum he has charged in his account. If the auditor had ascertained the time spent, and fixed a value by the day or month upon the receiver's services, his conclusion that they were worth " the amount charged " would have something on which to rest. If, for example, he had found the time spent to be one hundred and ten days, and fixed the value of the receiver's work at one hundred dollars per day, we could at least understand the process by which he reached his conclusion, whether we adopted his conclusion or not. As it is, we can adopt neither his conclusion of fact nor his conclusion of law on this subject. Upon the consideration of all the evidence we are disposed to allow a salary of three thousand dollars for the first year's services, and the further sum of one thousand dollars for subsequent services, making a total allowance of four thousand dollars. With the remaining seven thousand three hundred and sixty-six and sixty-six one hundredths dollars charged for services, he is surcharged.

But what ought a court of equity to require as to compensation for the use of this fund for three years? It did not belong to the receiver as an individual. He had no business to use one dollar of it, or to mingle it with his own funds. He was a trustee, the custodian of this fund, bound to use and preserve it for the owners as a prudent man would use his own. After the filing of the first account, and after this question

was raised, some of it was loaned, and it is interesting to observe what the trustee did. He loaned to three banks.

| | |
|---|---|
| To his own bank in Oil City . . . | $43,000 |
| To his own bank in Franklin  . . . | $15,000 |
| Total . . . . | $58,000 |
| To the first National Bank of Oil City . | $5,000 |

The interest received upon these loans and credited to the fund amounts to $1,912.50. He was still making profit out of the trust fund. It is true that an improvident order of the court below permitted these loans, and if they had been made in good faith to strangers it may be that for the time covered by them the trustee ought not to be required to account for more than he received in the way of interest, but on the circumstances of this case the receiver is in no position to shield himself behind the order. He knew the value of money. He had no right to profit by the use of this fund, and he ought to account as though the order had never been made.

| | |
|---|---|
| We charge him with interest for three years at four per cent on the fund . . . . . . | $7,560 00 |
| Upon this should be credited the interest accounted for . . . . . . . . . | $1,912 50 |
| Balance of interest surcharged . . . . | $5,647 50 |
| Surcharged out of compensation . . . . | $7,366 66 |
| Total surcharge . . . . . . . | $13,014 16 |

### DECREE.

And now, October 6, 1892, it is ordered that the decree of the court below be reversed and set aside and the exceptions to the report of the auditor so far as they relate to interest upon the funds in the hands of the receiver, and to the compensation charged by him, be sustained, and the compensation allowed is fixed at four thousand dollars. The interest to be accounted for by the receiver is fixed at five thousand six hundred and forty-seven dollars and fifty cents in addition to that accounted for in his account. The total amount with which the accountant is thus surcharged is thirteen thousand and fourteen dollars and sixteen cents. The fund for distribution as now adjusted is seventy-seven thousand nine hundred and ten dollars and seventy-seven cents, made up as follows:

Balance as stated by accountant . . $63,951 61
Interest on certificates falling due Nov. 15, '91 $945 00
Surcharged . . . . . . $13,014 16
$$\overline{\phantom{xxxxxxx}}$$
Total . . . . $77,910 77

It is further ordered that the costs of this appeal be paid by the appellee. The record is remitted for purposes of distribution.