## WALTON N. MOORE DRY GOODS CO. et al. v. LIEURANCE et al.

### No. 5660.

Circuit Court of Appeals, Ninth Circuit.

Feb. 10, 1930.

Francis J. Heney, of Los Angeles, Cal., and Clarence A. Shuey and Grant H. Wren, both of San Francisco, Cal., for appellants.

Edward R. Eliassen and Crosby & Crosby, all of Oakland, Cal., for appellees.

Before RUDKIN, DIETRICH, and WILBUR, Circuit Judges.

DIETRICH, *Circuit Judge*.

The ultimate questions upon this appeal are of the reasonableness of allowances made by the court below as compensation to one of two receivers, and to one of two attorneys and one of two accountants, for the receivers, for services in the liquidation, through a proceeding in equity, of the assets of an insolvent merchandising company known as R. A. Pilcher Company, Inc., and the distribution of the proceeds to creditors. The allowance so made to the receiver was $35,000; to the attorney, $30,000; and to the accountant, $10,769.71. The appellants, who are creditors of the estate appearing for themselves and in behalf of all other creditors, resisted the claims. The issues were tried before a master, and upon his report the court entered the order from which the creditors appeal.

In 1926 the Pilcher Company was operating sixteen retail stores in Northern Cali-

fornia, Oregon, and Washington. The major part of its indebtedness was owing to business houses in New York City, where it maintained its headquarters, and where it customarily purchased merchandise for distribution to its several stores. Following a meeting of creditors in New York in the latter part of May, 1926, a suit in equity was there instituted in the United States District Court by some, and in behalf of all, creditors, with a view to having receivers appointed. Apparently, it was then thought that the Pilcher Company's financial embarrassment would prove to be only temporary, for shortly prior thereto one or more of its stockholders had purchased additional stock for $75,000, which amount was then in a bank to the credit of the company, and it was hoped that other sales of stock would soon be consummated. In short, it would seem that the receivership was regarded as a friendly measure to meet a temporary emergency. However that may be, the court promptly appointed as receivers Arthur F. Gotthold, residing in New York City, and A. F. Lieurance, residing at Oakland, Cal. They selected as attorneys the firm of McManus, Ernst & Ernst, of New York, who had previously advised with the creditors and acted for them in instituting the suit, and Edward R. Eliassen, residing at Oakland. Eliassen was thus employed on June 3, 1926, and thereafter, within a short period, upon the suggestion of, and acting in co-operation with, Eastern counsel, he instituted ancillary suits in the federal courts of the Northern District of California, the Eastern and Western Districts of Washington, and the District of Oregon, in each of which jurisdictions the Pilcher Company had stores. Lieurance at once procured rooms adjacent to Eliassen's law offices in Oakland, and there the general administration work of the Western field was carried on, with an understanding between the two receivers that, in the main, Gotthold would be responsible for matters arising in the Eastern jurisdiction and Lieurance would have charge in the West. Gotthold employed an accountant in New York and Lieurance one at Oakland. These accountants were employed for what might be termed expert service, and in the West, at least, for a part of the bookkeeping, but some of the bookkeeping was done by others specially employed for that particular work. Local attorneys also were retained at Portland, Seattle, and Spokane. Each store continued to operate as a unit with a local manager and such help as was necessary.

It soon became apparent that the Pilcher Company would be unable to get in new capital or otherwise to meet its obligations, and about August 31, 1926, it was decided by all concerned that it would be best to sell the stores as going concerns, and, accordingly, steps were taken to that end, with the result that shortly after November 1, 1926, sales had been fully consummated and the entire assets liquidated. During all of this period, the creditors were organized with a recognized head of their committee in New York and one in Oakland or San Francisco.

Prior to December 1st there had been no order for a dividend or for allowances on account of compensation to the receivers or their attorneys in any of the jurisdictions. On December 6th Eastern counsel made an application to the New York court for an order for a forty per cent. dividend to creditors and for ad interim allowances to themselves and the Eastern receiver, without prejudice to allowances in the Western jurisdiction for Lieurance and Eliassen. On the following day Judge Hand in the New York court directed the suggested dividend, but deferred action upon the other branch of the application in order that he might become informed touching the probable demands of the Western receiver and attorney for compensation. Apparently, too, that was the desire of the creditors' committee. By telegraph and through conferences urgent requests were made upon Lieurance and Eliassen that they indicate what compensation they would ask or would deem reasonable, but they both declined, with the explanation that they would leave the matter entirely to the courts without suggestion upon their part. The efforts to that end terminated with an interview on the afternoon of December 9th between the Western representative of the creditors' committee and an attorney acting with him, on the one hand, and Lieurance and Eliassen on the other. They all were then of the view that the demands presented by the Eastern receiver and Eastern counsel were excessive, but Lieurance and Eliassen persisted in declining to make any suggestion as to what they would expect. Toward the close of the interview, a telegram was prepared, and that day sent by the representative of the creditors' committee at Oakland to the chairman of the committee in New York, of the contents of which all four parties had full cognizance. The telegram was as follows:

"Further answering your telegram. Receiver Lieurance and attorney intend having each ancillary Western court also order dividend forty per cent. To avoid possible con-

flict between Eastern and Western Courts as to amounts of allowances to receivers and their attorneys, as Chairman of Creditors' Committee here and member of New York committee, I earnestly request that question of such allowances be deferred for time being, until receivers and attorneys and committees can exchange views and come to some agreement concerning gross amounts to be asked for. Amounts of allowances to receivers and attorneys at this time by Judge Hand may prove unsatisfactory to ancillary courts who may order different amounts resulting in confusion. As you now know from yesterday's telegrams from Lieurance to Gotthold and attorneys McManus and Ernst, receiver Lieurance and attorneys in ancillary jurisdiction intend leaving amounts of allowances to discretion of ancillary courts."

Despite the apparent implication of the telegram that applications for allowances should not be pressed until further communication could be had between the parties in interest, with a view to reaching some agreement touching the gross amount to be asked for on these accounts, it is contended by Lieurance and Eliassen that, upon leaving the meeting, they had the understanding with the attorney who was acting for the creditors that they should at once proceed to make ex parte applications to the several Western courts for such allowances. Upon this point their testimony is in direct conflict with that of the other two parties to the conference; and not only is the alleged understanding out of harmony with the apparent import of the telegram, but that such a course would have been assented to is highly improbable. The creditors were opposing the proposed action in New York, not only because they thought the demand excessive, but because they were averse to any action until further efforts could be made to reach some agreement touching the gross amount to be allowed both receivers and their counsel. Lieurance and Eliassen were persistently unwilling to indicate even the maximum they would expect. Counsel for the creditors knew that, unless an agreement was reached, ultimately the courts would make the allowances, but what such allowances would be would naturally depend upon the showing made, and it is not reasonable to think that he would assent to a course by which such showing would consist only of the testimony of interested parties in an ex parte proceeding when no one was present to cross-examine or make a counter showing. Of course, the parties may have misunderstood each other. However that may be, without other notice to any one, Lieu-

rance and Eliassen appeared in the California court the next morning, and promptly secured an order for what was designated as an ad interim allowance to each. In seeking for some guide or standard, the court inquired of Lieurance when he was on the witness stand what he thought would be reasonable, and he responded by suggesting a certain percentage of the funds passing through his hands. If he believed that to be a fair standard, why did he not so advise the creditors in response to their reasonable and repeated requests? And, if the inquiry of the court was embarrassing to him, why did he not say that he felt incompetent to express an opinion, or explain that he had assured the creditors he would not make any suggestion of the amount to be allowed, and to keep faith with them either he should decline to make a suggestion or they should be given an opportunity to be heard? This he did not do.

Furthermore, after the California court had made this order, by which he was allowed $7,500, Gotthold $2,500, and Eliassen $10,000, in the evening of the same day he sent a telegram to Gotthold in New York, in which he not only failed to give the slightest intimation of what had just occurred in court, but he reiterated that he and Eliassen still felt that the "matter of compensation should be left entirely to the courts, without suggestion or recommendation on our part as to amounts." Without advising or intimating that action had been taken in one jurisdiction, he further stated that "this plan will be followed in ancillary jurisdictions"; and further that, "in view of the fact that fixation of fees and compensation will be left to the courts in western jurisdictions, it is impossible for me even to guess at amounts which will be allowed." This in face of the fact that definite allowances had just been made in one of the jurisdictions. The telegram closed with the statement: "Application for orders to pay forty per cent. dividend and allowances on account will be made in Northwest next week." The telegram was sent with the knowledge of Eliassen.

On the evening of December 10th Lieurance and Eliassen left Oakland for the North for the purpose of applying for and procuring like orders in the three other jurisdictions. The judge in Portland being absent, they went on to Spokane, where they procured an order on December 14th; to Seattle, where the order was made on the 15th; and to Portland, where the order was made on the 16th. In each court the procedure and testimony were substantially the same as in California; a five per cent. basis being suggested by

Lieurance for receivers' compensation, apparently computed upon all sales both at retail and in bulk. Seemingly in each case the court was advised of the amounts claimed in the New York jurisdiction, but at no point that the creditors were opposed thereto. On December 15th, while Lieurance and Eliassen were at Seattle, the former received from Gotthold a telegram on the subject, addressed to him at Oakland, and forwarded from his office there, but, instead of wiring directly in reply, and thus advising Gotthold where he was and what he was doing, he caused a reply to be sent in his name from his home office. In some manner learning of their address, the attorney for the creditors at San Francisco wired Lieurance and Eliassen in the afternoon of December 15th, while they were en route from Seattle to Portland, advising them that, because of certain conditions, it "was highly desirable" that they "should not apply for receivers' allowances or attorneys' fees in western jurisdictions until whole subject matter can be again discussed here." Without heeding or even acknowledging the message, they proceeded to Portland, and there took their order on the following day. The result of the ex parte enterprise was that in the four jurisdictions ad interim allowances were made on account of attorneys' fees aggregating $27,500, and on account of receivers' compensation $42,-587.51. Of this aggregate to receivers, in three of the jurisdictions the compensation was so divided that $4,500 thereof in the aggregate was awarded to Gotthold, and in the other jurisdiction the allowance of $5,000 was to both without division.

Upon learning of the proceeding and the results thereof through a telegram from Lieurance after the Portland order was made, the creditors expressed surprise and indignation, and employed additional counsel to take steps to obtain relief. Papers were prepared, but, before any were filed, a stipulation was entered into by which Lieurance and Eliassen consented to reduction of the aggregate allowance thus made to $15,000 for each, and agreed that, when applications were ultimately made to the courts for final allowances, due notice thereof would be given to all concerned, but this with the understanding that the compensations would not be less than these amounts. Gotthold also waived all allowances for his benefit in the Western jurisdictions. Subsequently, an application was filed in each of the Western courts for final allowance to Lieurance, Eliassen, and the accountant, of which timely notice was given. Whereupon a stipulation was entered into,

with the approval of the courts, to the effect that the entire subject-matter was to be submitted to the California court; and therein the proceedings were had to which we have first herein referred.

In the record, the nature and scope of the services rendered by Lieurance and Eliassen are elaborately explained, but we cannot here go into detail. To what we have said it is to be added that against the insolvent estate there were approximately 650 claims, aggregating $751,860. Preferred claims amounting to $5,811.34 were allowed and paid. Of the general claims only six were contested, and the difference between the total claimed and the total allowed was $27,249. In this difference was a single item of $16,382 arising out of a claim on an installment contract for the purchase of fixtures. Gross sales of merchandise over the counter while the business was kept going amounted to approximately $500,000, or a net, after paying the expenses of doing business, of approximately $225,000. As going concerns, the stores were sold for $257,600. In short, the total amount of the liquidated assets available for the payment of the receivers, their attorneys, the accountants, and other necessary expenses of the receivership, and for distribution to creditors, was approximately $467,000.

The active administration continued from early in June to the first part of November, 1926, or a period of about five months. After that time, the work related to passing upon some of the claims, making payment of the ordered dividends, which aggregated fifty per cent., the controversies involving compensation to receivers, their attorneys and accountants, and routine matters incident to closing up the administration. Lieurance was a competent business man, well qualified for the particular service by reason of long experience in the management of chain stores, and, admittedly, his conduct of the business here was in the main highly satisfactory. But in that connection it is to be noted his task was not to build up a new business or to create a new business organization. Eliassen was not specially qualified by reason of experience with receiverships; nor was such qualification essential. By reason of the magnitude of the business and the number of stores, scattered in four jurisdictions, many services were required, but there was no extraordinary litigation, and, in so far as we are able to discern, there were but few difficult legal problems to solve. For the work, such as it was, Eliassen was fully competent, and, with the exception of the controversy we have related, touching compensa-

tion, his service was apparently satisfactory to all concerned. In estimating a reasonable compensation, we must bear in mind, too, that the work was not done nor were the ends accomplished by a single individual. As already suggested, the business was taken over, equipped, and organized, and those who upon the ground actually conducted the business have been paid.

In the administrative work the receiver relied much upon his attorney and accountant, and thus greatly lightened his labors. For example, to pass upon a claim after the accountant had checked its correctness and the attorney had found no legal objection thereto amounted to little more than a formality. And to a certain extent the entire administration was a unit, a part of the responsibility being carried and the work done by the Eastern receiver and his assistants. Segregation of the service of each receiver was difficult, and, for that reason, as well as others, the suggestion made by Judge Hand and the urgent request on the part of the creditors should have been complied with. A just determination both as between the court officers and the creditors and in respect of apportionment among the several officers was more likely to result from a submission to a single committee or court than from a piecemeal consideration in the several tribunals acting independently. Many of the services related alike, or in some measure, to all jurisdictions, and to fix a fair compensation in any one without having knowledge of and considering all would be a most difficult task. As a result of the course pursued, the allowances in the five jurisdictions, if we take those originally made in the Western jurisdictions, aggregate $50,087.51 for the receivers, $42,500 for the attorneys, and $18,469.71 for accountants; or, if we take the allowances as they now stand, a total of $42,500 for receivers' fees, $45,000 for the attorneys, and $18,469.71 for the accountants, or a grand total of nearly $106,000. Of this amount approximately $75,770 was awarded to the Western receiver and his assistants, and $30,230 to the Eastern receiver and his assistants. It may be inferred that each group entertains the view that the allowances to the other were too liberal, but, however that may be, the action of the New York court is not here for review, nor without more information touching the showing upon which it was based can we consider it a persuasive precedent.

During the five-month period of active business, Lieurance assiduously devoted all of his time to the trust; thereafter his service was necessarily limited to routine matters, and was not onerous. During the early period, Eliassen gave to the receivership most, but not all, of his time. He had been engaged in the general practice of law, and that he carried forward. The two suites of offices being adjacent, conferences could be had informally without waste of time or absence from his office. On divers occasions, his duties called him from his office and the city, but, generally speaking, no absence was for a long period. He kept what may be called an office diary, in which from day to day he noted with great particularity every service relating to the receivership, including conferences, time spent in investigation and in the preparation of papers, the writing of letters, and even the receipt of letters and telegrams. From this record it would appear that during the six-month period from the early part of June to the early part of December, 1926, he is to be credited with some activity, either important or trivial, every day, with the exception of twenty-five days in the aggregate, upon which he made no entry other than, in three or four instances, of the receipt merely of a letter or telegram. After that time, his services, except in so far as they pertained to the subject-matter of the present controversy, were of a routine character and of little moment.

Neither by statute nor rule of court is any standard afforded for fixing such compensations. We may perhaps give some consideration to the fact that in a judicial administration of a trust there is a measure of formality, and at times responsibility, from which a similar service is free when rendered in a private capacity; but, where the receiver has the assistance of competent counsel, the difference will ordinarily not be great. In the main, we are in accord with the statement of the principle and of the considerations by which courts should be guided, made by the Supreme Court of Montana in Hickey v. Parrot Silver & Copper Co., 32 Mont. 143, 79 P. 698, 701, 108 Am. St. Rep. 510, as follows:

"The law does not compel one to accept from the court employment as a receiver, any more than it compels him to accept employment from the owner as a superintendent. If he jeopardizes other interests by accepting the receivership, he does it voluntarily, and is not entitled to be recompensed therefor.

"It is well established that the compensation allowed a receiver must be reasonable, but why compensation must be greater, in

order to be reasonable, for doing certain work, when the hiring is done by the court, than it would be for the same duties if the hiring were done by an individual, is not apparent. Where extra duties are enjoined, as giving a bond or otherwise, that are not compensated for in some other manner, additional pay may be allowed; otherwise there is no reason why it should not be the same. And these remarks apply equally to allowances for counsel fees.

"The considerations that should be controlling with the court in fixing compensation are the value of the property in controversy; the practical benefits derived from the receiver's efforts and attention; time, labor, and skill needed or expended in the proper performance of the duties imposed, and their fair value, measured by the common business standards; and the degree of activity, integrity, and dispatch with which the work of the receivership is conducted. The percentage basis is not always the equitable method. As was said in Grant v. Bryant, 101 Mass. 570, 'The court does not regulate the compensation of its officers upon the basis of a fixed commission upon the amount of money passing through their hands, but allows them such an amount as would be reasonable for the services required of and rendered by a person of ordinary ability and competent for such duties and services.' See, also, the following cases: Schwartz v. Keystone Oil Co., 153 Pa. 283, 25 A. 1018; Boston Safe Deposit & T. Co. v. Chamberlain, 66 F. 847, 14 C. C. A. 363; French v. Gifford, 31 Iowa, 428; Jones v. Keen, 115 Mass. 170; Martin v. Martin, 14 Or. 165, 12 P. 234; U. S. v. Church, etc., [6 Utah, 72], 21 P. 516; Sherley v. Mattingly (Ky.) 51 S. W. 189; Union National Bank v. Mills, 103 Wis. 39, 79 N. W. 20."

Lieurance had had long experience in the chain store business. With a company operating approximately six hundred stores he had held a highly responsible position, and as compensation for his services he had received an annual salary of $10,000. He was also a stockholder in sixteen of these stores, and upon his stock he had received divers dividends running as high as $30,000 per year; but presumptively the dividends represented investment earnings rather than compensation for services. The administration of the Pilcher Company's affairs might have been had under the Bankruptcy Act (11 USCA). In fact, a bankruptcy proceeding was commenced and is still pending. Had the equity proceeding been abandoned and the administration been carried on in bankruptcy, it would have been in the same courts, and presumptively would have taken substantially the same course with approximately the same results; trustees, with similar duties and responsibilities as the receivers, would have liquidated the estate. And it is shown in the record by a witness familiar with the Bankruptcy Act, and experienced in the computation of the statutory compensation of trustees in bankruptcy, that such compensation would not, under any reasonable view of the record, exceed $10,000. True, the amount so received by Lieurance while he was employed in private capacity is not conclusive; nor in a proceeding in general equity are we bound by statutory standards established for bankruptcy administration. But for the reasons already suggested, the considerations are of substantial persuasive value. Taking into account all the circumstances, including a consideration to be referred to in connection with the accountant's claim, we are of the opinion that $15,000 is a reasonable allowance for the receiver, and that amount he has already been paid.

Touching attorneys' fees, in the nature of things a satisfactory measure is even more difficult to find. In bankruptcy proceedings, there is no fixed statutory standard. Several attorneys and others testified what in their opinions would constitute a reasonable allowance. Not unnaturally these opinions exhibit a diversity. But, aside from that consideration, unsupported by persuasive reasoning or proof of custom, they are of little aid. In a case like this it is not apparent how ordinarily an attorney can be any better informed on the subject than the court itself. Eliassen has received $15,000, out of which sum he has paid to local attorneys for their assistance at Portland, Spokane, and Seattle the aggregate amount of $2,650. We are of the view that an additional allowance of $5,000 will reasonably compensate him. In neither case have we deemed it proper to consider as a basis for compensation activities pertaining to the ex parte proceedings in December, 1926, which resulted in the orders for ad interim allowances.

The accountant, Hershey, has been paid $10,000, and by the court below an additional sum of $769.71 was allowed. We are convinced that the compensation he has already received is liberal, to say the least, and that many of the services rendered could as well have been performed by the receiver himself or by an ordinary clerk or bookkeeper. To employ a high-priced expert to perform a

service requiring no special skill is an unwarranted extravagance. We have concluded that it was error to order payment of the additional amount, and, instead of undertaking the difficult task of determining to what extent the $10,000 is in excess of what would be a reasonable compensation for services providently required of an accountant, we have taken the matter into consideration in fixing the receiver's compensation, and have endeavored thus to allow amounts reasonable for all the services by whomsoever rendered.

In reaching these several conclusions, we have not been unmindful of the rule that in respect of such matters there is vested in the trial court a measure of discretion with the exercise of which an appellate court will not ordinarily interfere. And, were we able to reach a conclusion not widely at variance with that of the lower court, we would be disinclined to disturb the order under review. But here the issues do not rest upon conflicting testimony, other than opinion testimony, and, in respect of most of the services and the circumstances, our information is substantially the same as that of the trial court; hence, in exercising an independent judgment, we have substantially the same information that was available to the trial judge. That being true, we cannot, in the face of conclusions to which we are constrained, so greatly at variance with those of the trial court, evade responsibility by resorting to the rule of discretion which the appellees would have us invoke.

The order appealed from is reversed, with directions to enter one in harmony with the conclusions herein expressed.