## Pennsylvania Turnpike Commission v. Evans

*Henry E. Harner* and *Dilworth, Paxson, Kalish, Kohn & Dilks,* for plaintiff.

*Compton, Handler & Berman, David J. Conroy, H. G. Stutzman, Christian V. Graf, Stradley, Ronan, Stevens & Young* and *Frederick G. McGavin,* for defendants.

PER CURIAM, September 20, 1957.—Plaintiff has applied for the appointment of a receiver pendente lite for Manu-Mine Research & Development Company, a Pennsylvania corporation, hereinafter referred to as Manu-Mine, one of defendants in this equity proceeding.

In this action, plaintiff seeks equitable relief because of moneys that were paid to Manu-Mine on account of work done under certain contracts with the Pennsylvania Turnpike Commission, plaintiff, referred to herein as the commission. In its complaint plaintiff maintains that moneys were obtained by Manu-Mine as a result of fraud and an unlawful conspiracy on the part of these defendants to defraud the said commission and the citizens of this Commonwealth, and asks for the appointment of a receiver pendente lite.

The complaint was filed March 6, 1957, and by written application filed on August 7, 1957, plaintiff also

asks for the appointment of a receiver pendente lite for Manu-Mine on the ground of such conspiracy and fraud, and further asks for the appointment "so that the assets of the corporation may be preserved and protected". An answer was filed to this application denying that there was any fraud. At a conference with counsel for the commission and Manu-Mine, the court fixed a hearing for September 4 and 5, 1957, when testimony was taken.

At this hearing, Seaboard Surety Company, herein referred to as Seaboard, a corporate surety for Manu-Mine under another contract and whose principal place of business is in New York City, intervened as a party defendant, as did also the First National City Bank of New York. Both of these intervening defendants oppose the appointment of a receiver for Manu-Mine.

While several contracts are involved in this suit, we are principally concerned at this stage of the proceeding with a certain contract of February 28, 1955, entered into between the commission and Manu-Mine. This contract made provision for the drilling of holes and slushing coal mine voids so as to provide subsurface support on the northeastern extension of the Pennsylvania Turnpike in the anthracite coal region of this Commonwealth.

We can take notice of our own records, and it is therefore appropriate to note that because of differences that had arisen between Manu-Mine and the commission, Manu-Mine had instituted five suits in assumpsit to recover the amounts it claims to be due under various contracts with the commission.* Ac-

---

* The dates of the entry of the actions in assumpsit in which Manu-Mine is plaintiff are as follows: No. 195, Commonwealth Docket, 1956—April 30, 1956; No. 213, Commonwealth Docket, 1956 —May 15, 1956; No. 214, Commonwealth Docket, 1956—May 15, 1956; No. 305, Commonwealth Docket, 1956—August 9, 1956; No. 306, Commonwealth Docket, 1956—August 9, 1956.

cording to the testimony, Manu-Mine's claim against the commission totals $833,167.71. In this equity proceeding, the commission claims $11,329,141.59.

Plaintiff maintains that Manu-Mine made a certain representation in a communication to the commission dated December 3, 1954, that by use of a certain no. 32 air blast drill, crews would drill an average of 25 feet per day, producing a profit to Manu-Mine of 10 percent on this drilling and slushing work. By a subsequent letter, the estimate as to depth per day of drilling was modified to 28 feet.

The testimony shows that Charles W. Stickler, Jr., president of Manu-Mine, had in mind using a certain type of drill identified as 42T, and that actually shortly after the contract of February 28, 1955, was executed, Manu-Mine made use of a BH58 drill which drilled anywhere from 40 feet to 160 feet per day. Plaintiff contends that these statements amount to a fraudulent representation, when considered in the light of the profits which the commission claims were made under the contract. The commission's contention in this respect seems to be predicated upon a rule enunciated in Restatement of the Law of Contracts, vol. II, §473, p. 900, as follows: "A contractual promise made with the undisclosed intention of not performing it is fraud".

We summarize, then, the contentions of the parties. The complaint avers fraud and an unlawful and wicked conspiracy. The application for a receiver pendente lite alleges such fraud and conspiracy, and plaintiff contends that the evidence in this record, when considered in the light of the profits actually realized from the operation, indicates that there is reasonable cause to believe that the contract of February 28, 1955, was fraudulent. Manu-Mine, of course, denies that there was any such fraud, both in its answer to the application and in its argument at the hearing, and

denies that the evidence would support any finding that there was a reasonable cause to believe that there was fraud.

Work under defendant's contract of February 28, 1955, was stopped on April 25, 1956. In approximately 14 months, Manu-Mine was paid $6,724,718.74 for drilling and slushing under this contract, and for supervision and inspection defendant was paid $121,-722.90, making total payments under that contract of $6,846,441.64. In addition thereto, Manu-Mine claims from the commission the unpaid balance of $833,167.71. Therefore, defendant's total claim under its contract of February 28 is $7,679,609.35. Manu-Mine's cost, as revealed in the testimony at the hearing, exclusive of overhead, was $2,431,321.52. There was paid, then, to Manu-Mine under the contract of February 28, the sum of $4,415,120.12 over and above costs.

Mr. Stickler was the nephew of the commission's chairman at the time the contract of February 28 was negotiated. The record shows that he was paid by Manu-Mine in 1954, 1955 and 1956 substantial salaries and bonuses which plaintiff contends were excessive. Mrs. Stickler was secretary-treasurer of Manu-Mine. She likewise received salaries and bonuses, as did other officers. Mr. Richard Evans, deceased, a son of Thomas J. Evans, former chairman of the commission and one of defendants herein, was also an officer and received salaries and bonuses. Payments were also received by some other relatives of the Sticklers.

Ten thousand dollars is shown to have gone into the purchase of furniture in the Stickler home in Reading. A trip to Hawaii was made by the Stickler family at a cost of approximately $6,000. The purchase of a mink coat was also made for Mrs. Stickler. Mr. Stickler owned an office building in Reading. The building was erected by employes of Manu-Mine at Stickler's expense. The cost to Mr. Stickler for the building and

improvements made to the land was $100,000. This building, along with Mr. Stickler's house, garage and tool house, 40 to 50 acres of land in all, were sold by Stickler to Manu-Mine for $310,000.

There was a corporation known as Stickler Associates. Its activities were not specified. It had the same officers as Manu-Mine. Its fiscal year ran from November 1 to October 31 of the succeeding year. Payments were made by Manu-Mine to Stickler Associates for the fiscal years as follows: 1954, $44,434.88; 1955, $135,958.00; 1956, $100,030.78.

American Testing Laboratories was a wholly owned subsidiary corporation of Manu-Mine. During the fiscal year ending October 31, 1955, this corporation received from Manu-Mine $55,026.53, and for the year ending October 31, 1956, $60,119.79.

Such substantially is the testimony concerning the expenditures of money by Manu-Mine. The testimony leaves unreconciled the receipt of $4,415,120.12 over and above costs under the contract of February 28, leaving out of consideration, of course, overhead.

It should be noted that in addition to the contract of February 28, Manu-Mine also received the sum of $1,763,535.62 under a certain contract relating to work on turnpike tunnels which was executed May 25, 1953. Manu-Mine also received on an exploratory drilling contract on the northeastern extension of the turnpike, entered into prior to the contract of February 28, 1955, the sum of $377,122.60.

"Receiverships are invariably of property . . .": 45 Am. Jur., Receivers, §32, p. 33. The appointment of a receiver rests "in the sound discretion of the court; and, in exercising such discretion, it (the court) proceeds cautiously and is governed by a view of the whole circumstances of the case. No positive or unvarying rule can be laid down as applicable to all cases. If there

be no danger to the property and nothing to show the necessity or expediency of appointing a receiver, none should be appointed": Beaumont v. Beaumont, 166 Pa. 615, 616 (1895). It is, therefore, incumbent upon us to determine what the status is of Manu-Mine's property and whether it is necessary and expedient that a receiver should now be appointed.

The last financial statement of Manu-Mine was prepared as of May 31, 1957. It shows an excess of liabilities over assets, a deficit of $392,990.53. The statement does not include a claim against the Federal Government for accrued tax refunds which Manu-Mine has filed in the amount of $866,358.97. The tax refund claim, of course, has not been passed upon by the Federal taxing authorities. The financial statement does not include Manu-Mine's claim against the commission in the amount of $833,167.71, the validity of which is denied by plaintiff herein by the very nature of these proceedings.

The statement shows depreciated capital assets of $1,045,526.01, consisting mostly of land and machinery. The other assets shown in this exhibit are made up of accounts receivable and unspecified securities. In giving consideration to the assets of this company, we must bear in mind the testimony concerning claims and liens against these assets.

Manu-Mine obtained three Navy contracts executed as of May 21, 1956, June 18, 1956, and October 29, 1956. The contracts were to be performed in Charleston, S. C. For the purpose of performing these contracts, Manu-Mine purchased machinery and liened that machinery to Fidelity-Philadelphia Trust Company in the amount of $590,000, which lien has now been reduced to $292,000.

Seaboard, the intervening defendant, became surety on Manu-Mine's performance bond on the Charleston contracts. Manu-Mine defaulted on these contracts. It

was necessary for Seaboard to take over and procure other contractors to complete the work on these projects. In this connection, it should be noted that Manu-Mine sustained an operating loss from November 1, 1956, to May 31, 1957, of $1,530,210.38.

On March 22, 1957, in connection with the defaults on the Charleston contracts, and in order to complete the same, Seaboard obtained from the First National City Bank of New York a loan to Manu-Mine of $1,-024,062.37, which was increased in June by $432,-698.05, totaling $1,456,760.42. Manu-Mine delivered to the bank its promissory notes and Seaboard guaranteed the payment of the loan to the bank. As collateral security for its guarantee, Seaboard acquired from Manu-Mine certain liens and assignments of its assets.

Six mortages were executed on Manu-Mine's real estate in the principal amount of $1,000,000 each. Machinery and other chattels and personal property were assigned. Manu-Mine assigned to Seaboard its claim for Federal tax refund in the amount of $866,358.97. Ninety percent of Manu-Mine's common stock was also assigned. It is fair to state that the liens and prior claims of Fidelity-Philadelphia Trust Company and Seaboard Surety Company absorb all of the fixed assets and also give Seaboard a priority on the unliquidated claim for tax refund against the Federal Government.

Under the evidence there is only one item of property within the jurisdiction of this court that is not covered by any liens or priorities, namely Manu-Mine's bank account in the Berks County Trust Company in the amount of $15,000. What, then, should be the disposition of the court with respect to the appointment of a receiver, having in mind these outstanding liens and priorities, and bearing in mind also that there is no showing in this record that there is any invalidity in these prior liens?

"A general rule governing the proof and disposition in receivership of particular claims, interest, and liens is that existing priorities are preserved, the receivership not operating to disturb them. Indeed, it is the duty of the receiver to protect valid preferences and priorities": 45 Am. Jur., Receivers, §238, pp. 185-86. In Geroy v. Upper, 182 Or. 535, 174 A. L. R. 1355, 1362, 187 P. 2d 662 (1947), the Oregon Supreme Court stated, we believe, the correct rule as follows:

" '. . . The general rule is that the appointment of a receiver will not change any existing contractual relation or create any new contractual relation or right of action thereon, and a receiver can do nothing to impair a contract as between the parties thereto. Such an appointment does not in general operate to excuse performance of an existing contract, nonperformance giving the other party a cause of action for damages. The rule has been applied to contracts of sale and purchase, although there is some contrary authority, particularly among the earlier cases, in this connection . . .': 45 Am. Jur., Receivers, section 138.

" 'A receiver holds the property coming into his hands by the same right and title as the person for whose property he is receiver, subject to liens, priorities, equities, privileges, claims, defenses, and estoppels existing at the time of his appointment. In other words, a receiver possesses no rights with respect to the trust property superior to those which would be possessed by the one for whom he was appointed, were the latter acting for himself. Furthermore, the appointment of a receiver vests in the court no absolute control over the property, and no general authority to displace vested contract liens. The receiver stands in the shoes of the corporation or person whose property is in receivership with exactly the same rights and obligations, with respect to such property, that such per-

son had at the inception of the receivership . . .': 45 Am. Jur., Receivers, section 156."

In Pearson Mfg. Co. v. Pittsburgh Steamboat Co., 309 Pa. 340 (1932), our own Supreme Court said, at page 345:

". . . The legal status of a receiver, his authority and duty, is clear. He is 'the officer, the executive hand, of a court of equity. His duty is to protect and preserve, for the benefit of the persons ultimately entitled to it, an estate over which the court has found it necessary to extend its care': Schwartz v. Keystone Oil Co., 153 Pa. 283, 286, . . . . He takes only the interest of the owner of the property subject to all valid liens and encumbrances against it: Phila. Trust Co. v. Northumberland County Traction Co., 258 Pa. 152, 172, . . .; see also Pramuk's App., 250 Pa. 45, . . .; McDougall v. Huntingdon & Br. T. R. & C. Co., 294 Pa. 108, . . . ."

There is nothing fraudulent in a debtor giving a preference to some of his creditors by paying or securing his obligations to them: Peoples-Pittsburgh Trust Company v. Holy Family Polish National Catholic Church, 341 Pa. 390 (1941). And this is true even though the debtor is insolvent: Seip v. Laubach, 333 Pa. 225, 227 (1939). See also Varsity Building and Loan Association v. Ankele, 117 Pa. Superior Ct. 45 (1935).

There is no showing in this record that a receiver would have any assets to administer that would be derived from this liened property. Manu-Mine at the present time is not engaged in the performance of any projects. Under these circumstances, the appointment of a receiver does not seem reasonably expedient, since it is not shown that there is any property for that receiver to administer.

As of March 9, 1951, Manu-Mine's common stock had a book value of $100 per share. On October 31, 1955, that value was $42,614 per share. As of May 31,

1957, it had no value. One cannot read this record without wonderment as to where all the money went. The testimony affords no clue. The company's assets are heavily liened, and save for the $15,000 deposit, "the cupboard is bare" at this time.

Plaintiff asks that a receiver inquire particularly into the lien of Seaboard Surety Company. Such inquiry would require the extensive services of an accountant to examine into the records of the company. Legal services would be required. In fact, the chief problem seems to us to be one of accounting if more assets are to be revealed than are shown in this record. With $15,000 here available to meet the expenses of the receiver, counsel fees, accounting costs and other expenses, and bearing in mind that priorities exist as to all other assets, the appointment of a receiver would seem to be lacking in expediency. The truth of the matter is that on the basis of this record, Manu-Mine is without assets, because the costs would more than absorb the balance in the bank. No useful purpose would be served by the appointment of a receiver to search for assets, absent any clue as to where to find them, particularly since any estate in receivership would not contain sufficient funds to make an effective search.

Hence, in the light of the status of Manu-Mine's heavily liened assets, we think that a receiver should not be appointed for this company at this time. However, we believe that some security should be afforded to plaintiff against further depletion or dissipation of the sum of $15,000 now deposited to the account of Manu-Mine in the Berks County Trust Company, as well as any assets and funds coming into Manu-Mine's hands after the satisfaction of the prior liens and claims now outstanding. It is our view that the prayer in plaintiff's complaint for a preliminary injunction should be granted. Accordingly, a preliminary injunction shall issue restraining Manu-Mine from disposing

of such assets. In view of the foregoing, we herewith enter the following

### Order

And now, September 20, 1957, the application for a receiver pendente lite is refused. An injunction, preliminary until hearing and final disposition of this case on its merits, is herewith entered against Manu-Mine Research & Development Company; said company is herewith enjoined and restrained from transferring the sum of $15,000 or any portion thereof, now deposited to its account in the Berks County Trust Company, and is enjoined from drawing against that account or disposing of the same in any manner; further, the said Manu-Mine Research & Development Company is herewith enjoined and restrained from disposing of any assets and funds that shall come into its hands, representing the equity of said company after the payment and satisfaction of prior liens and claims as mentioned in this opinion.