[6] .That the fall of the slab was caused by a workman from another building does not operate to relieve the defendant from liability. The admission of strangers to the bank building had not been forbidden, and visitations by workmen from across the street had been frequent and with the defendant's knowledge. The conduct of the one who, in walking by the stacked marble on an established plankway in daily use, so jostled it as to cause the falling of the slab which struck the plaintiff, was not unusual, and the passage of any other person over such plankway in the course of his employment might well have produced the same result. Had the slabs been laid lengthwise on the floor, or otherwise safely placed, the accident would not have occurred. Within the rule stated in Toledo, St. L. & W. R. Co. v. Kountz, 168 Fed. 832, 94 C. C. A. 244 (C. C. A. 6), the proximate cause of the plaintiff's injury was the dangerous method in which the marble was stacked.

Other errors are assigned and argued, but they are not well taken, and are not deemed of sufficient importance to warrant extended consideration.

No error appearing on the record, the lower court is affirmed.

---

## In re BERKELEY.

### Appeal of BUSHBY.

(Circuit Court of Appeals, Second Circuit. January 13, 1913.)

#### No. 77.

1. BANKRUPTCY (§ 91*)—INVOLUNTARY PROCEEDINGS—SUFFICIENCY OF EVIDENCE.

Evidence considered on the hearing of a petition in involuntary bankruptcy, and held insufficient to establish any indebtedness of the alleged bankrupt, except, perhaps, to the original sole petitioner, or to show that he was insolvent at the time the petition was filed.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 137–139; Dec. Dig. § 91.*]

2. EQUITY (§ 394*)—MASTERS—COMPENSATION.

Where the rules of court fix the per diem compensation of a master, unless an additional allowance is made, a stipulation by which the parties to a suit agree to pay him an increased amount is in violation of such rules, and will not be sanctioned.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 857–859; Dec. Dig. § 394.*]

Appeal from the District Court of the United States for the Southern District of New York; Charles M. Hough, Judge.

In the matter of Lancelot M. Berkeley, alleged bankrupt. Appeal by James C. Bushby from a decree dismissing petition. Affirmed.

The following is the opinion of the District Court, by Hough, District Judge:

[1] The petition herein was filed April 21, 1910, as a one-creditor petition. Subsequently there appeared as copetitioners Daniel D. Bailey, as executor of Elbert Bailey, and Leo Levy, as assignee of Herman Scheideberg.

Quite early in the proceeding Judge Hazel required Bushby, Levy, and Bailey to file bills of particulars, setting forth what, if any, indebtedness they claimed against Berkeley. Bailey specified as his claim $400 of costs received by Berkeley as his (Bailey's) attorney. It may be that Berkeley owes Bailey some very small amount—what amount it is impossible to ascertain from the record—but it is plain that he does not owe Bailey what Bailey said he did.

Mr. Levy specified as Scheideberg's claim assigned to him $23.30 of costs, for which an execution had been issued and returned "No property." I discover nothing in the record to substantiate this claim; but, on the contrary, it is made to appear that before the execution had been issued the action out of which it grew had been totally discontinued, without costs to any party as against the other. Thus this contest should rather be entitled Bushby v. Berkeley, and requires an examination into the past relations of the parties much more thorough than is shown by the master's report.

For some considerable time before December, 1906, Messrs. Bushby and Berkeley had been copartners in the practice of the law. In the month named their partnership was dissolved by mutual consent, and it seems that most of the business of the firm was to be continued and wound up by Berkeley; he paying to Bushby a specified portion of the proceeds of each unclosed litigation. A considerable part of the business of the firm seemed to have been the promotion, on contingent fees, of suits against railway companies for injuries to abutting owners by reason especially of the erection by the New York Central Railway of the Park avenue viaduct; but they also dealt in claims (of the familiar kind) against the elevated railways of this city. Berkeley continued to perform the terms of dissolution and, as alleged by Bushby in his petition, paid him, during the year 1907, the considerable sum of $17,699.60 as his share of divers litigations.

The documents evidencing the dissolution agreement suggest, if they do not prove, a spirit of hostility between the former partners existing as early as December, 1906, but certainly by 1908 hatred arose between them.

Toward the end of that year the Appellate Division of the First Department decided, in Re Larney, 128 App. Div. 902, 927, 112 N. Y. Supp. 1134, that, under the terms of retainer given to Bushby and Berkeley by one Larney, any allowance for costs obtained by Bushby and Berkeley upon the settlement of the Larney claim belonged to the client, and not counsel. No opinion was filed by the Appellate Division, but it is evident that decision must have been founded on the terms of that particular retainer.

It is obvious from the evidence before me that this decision greatly alarmed both Bushby and Berkeley; for if Larney could obtain relief of this kind, why could not every other client whose retainer was in similar language?

It is also obvious from the record that such was the condition of hostility between the ex-partners that each believed the other was trying to avoid his share of this possible liability; and Berkeley believed that Bushby, whose partnership share of losses and profits was the greater, was seeking to avoid ultimate payment of such share by seeking out clients and inciting them to pursue Berkeley. Berkeley also charges that Bushby sought to render himself "execution proof" by conveying property to his wife.

This is all immaterial, except in so far as it shows the spirit in which this bankruptcy matter has been carried on; and it also accounts largely for the extent and quality of this record, over the accumulation of which the master seems to have exercised no authority whatever.

One result of Berkeley's view of Bushby's attitude regarding the possible claims by former clients of both of them was that Berkeley refused to continue to pay to Bushby his pro rata of completed business, alleging breaches of Bushby in respect of the dissolution agreement and the necessity of protecting himself against possible claims of former clients. Thereupon, and some time prior to April, 1909, Bushby brought an action for an accounting against Berkeley, in which an interlocutory judgment was had, and pursuant

thereto Berkeley filed an account, which is in evidence. This interlocutory judgment was reversed on appeal, and thereafter, and subsequent to the filing of this petition in bankruptcy, it was tried again, and interlocutory judgment again directed for Bushby; and thereupon another account was filed by Berkeley (in September, 1910), which is also in evidence. In these accounts Berkeley admits receiving from divers litigations sundry sums of moneys out of which he declares that Bushby would be entitled to a considerable part, had he performed his agreements. In each of these accounts Berkeley stated, not as a debt due by him, but as an offset against amounts claimed by Bushby:

"Sums collected by the firm of Bushby & Berkeley as costs in litigated cases and not paid to clients (the said firm being under the impression that they had the right to retain said costs), about $50,000, of which the share of J. C. Bushby is about $30,000."

This declaration evidently covers not only outstanding claims in process of collection through Berkeley, but the entire business of the firm, so far as it might be affected by the decision in Re Larney.

In the spring of 1910 Bushby seems rather to have had the best of it in litigation growing out of this disgraceful professional squabble. The accounting suit had been tried for the second time before Judge Brady on March 17 and 18 and April 4, 1910; and it is inferred from this record that the intimations were quite strong that plaintiff would again get an interlocutory judgment. Bushby then seems to have noticed with alarm that in December, 1909, and January, 1910, certain deeds had been recorded in this county, which transferred title to apparently valuable pieces of real property from L. M. Berkeley to Robert C. Berkeley, and thereupon this petition in bankruptcy was filed, alleging that Berkeley had less than 12 creditors; that he was indebted to Bushby in a sum exceeding $8,000 (provable debts); and that Berkeley had conveyed, with intent to hinder, delay, and defraud his creditors, within four months of petition, and while insolvent, the real property above referred to. (The fraudulent assignment of a certain fund is also alleged, but no further attention will be paid to this allegation.)

Of this petition it is first to be noted that, if Bushby believed that he and Berkeley owed very numerous clients of their firm large sums for costs, he must have known that he was swearing to an untruth in alleging that Berkeley had less than 12 creditors.

On the other hand, the evidence warrants the inference that if he believed that Berkeley had no more than 12 creditors, then, on the evidence, Berkeley had no other creditor except Bushby himself. To this petition Berkeley filed an answer, in which he denied any indebtedness to Bushby, denied insolvency, and left undenied and unalluded to an allegation of the petition to the effect that certain moneys in which both Bushby and Berkeley were interested had been deposited with the chamberlain of this city, in order to protect the interests of both.

The effect of the pleading, therefore, is that Bushby alleges and Berkeley admits an asset in the alleged bankrupt, at the date of petition filed, of approximately $1,000.

On these issues the parties went to trial. It must be obvious that this case could have been tried in one of two ways: Either (1) Bushby could have been content with proving his asserted claim of approximately $8,000 and the apparently fraudulent nature of the transfers to R. C. Berkeley, and then left L. M. Berkeley to prove solvency, if he could; or (2) He could have shown, not only his own claim, but those of the clients of the firm, and then proceeded as before.

With respect to the second method of trial, no effort has been made to demonstrate the existence, amount, or provability of the alleged clients' claims, except to put in evidence the accounts furnished by Berkeley in the accounting proceeding above alluded to and quoted from.

No client (except Bailey, whose effort is a failure) has come forward to show his own claim, while it is made to appear that in November, 1909, an effort was made to put the claims of clients into the hands of a committee, which committee had employed Forster, Hotaling, and Klenke as attorneys

to collect the same from Bushby and Berkeley. It also appears that these attorneys took summary proceedings against Bushby and Berkeley on behalf of certain alleged clients named Nicholas, Bach, and Bullenkamp. These motions came on before Judge Blanchard, and were denied, and no further proceedings have ever been had. This was in the spring of 1910.

It is on such testimony that Bushby, asks that Berkeley be held bankrupt, unless he can show that, exclusive of transferred or concealed property, he was worth at the time of filing petition more than $50,000, plus the $8,000 advanced by Bushby as his personal claim.

On this point, which is a vital point in the matter, the report of the master is silent. I am not informed as to the grounds of Judge Blanchard's decision; and it is but an inference from this record that the judgment of the Appellate Division in Re Larney must have proceeded upon the terms of the retainer. When no other client, except Larney, has come forward with a demand for costs, except those who were defeated a year and a half ago, and have acquiesced in defeat, it is certainly a far cry to hold that Berkeley (and, of course, Bushby also) is indebted in $50,000 to people not one of whom can be found in this proceeding to advance and prove the debt.

Bushby denies that he owes anything to clients, either individually or as a partner, yet on his own showing, if Berkeley owes the money, he (Bushby) must also owe it. Such a position on his part does not induce belief in the actual existence of debts to this amount.

As for the admission contained in the account filed by Berkeley, the whole account must be taken as rendered; one part is just as good as another, and no better, for purposes of evidence against Berkeley.

On the whole document it is plain that he was endeavoring, not to declare his relation to ex-clients, but his relations to an ex-partner, and that was all he was obliged to do. What it means is this: That when he settled with Bushby he insisted upon settling also their relations to their clients. Whether he had a right to insist upon this in that particular suit is not a matter that concerns this court, but it does govern the interpretation of the document. It is therefore held that there is no sufficient proof in this case that Berkeley is indebted to anybody, unless it be to Bushby.

Into the pecuniary relations between Bushby and Berkeley I do not find it necessary to go at length. Most of the record is made up of the recriminations of these two members of the bar, oftentimes acting as their own counsel and testifying as witnesses at the same moment. If any evidence were needed of the impropriety of such procedure, this record furnishes it in abundance.

I shall assume, but not find, that Berkeley was, on April 21, 1910, indebted to Bushby in the sum of not more than $8,000.

It may be noted here, however, that no ground is seen for asserting as a debt provable on April 21, 1910, Bushby's costs in the accounting proceeding. They have never been taxed; they have never even been awarded; non constat that they ever will exist. Certainly there was no form of proceeding in which Bushby could have asserted his right to these costs against Berkeley at the time he filed his petition in bankruptcy.

Bushby must show, first, that the acts of bankruptcy alleged in the petition were committed. Admittedly the transfers were made, admittedly the transferee was the alleged bankrupt's father, and the conduct of Berkeley when he was examined as to these conveyances was plainly such as to encourage belief in his intention to put the real estate in question beyond the reach of creditors, present or future. Upon the whole case I am of opinion that the transfer from son to father was a conveyance in fraud of creditors, and am of opinion that such conveyance was made in order to prevent, if possible, what Berkeley believed to be at the time Bushby's intention, namely, to saddle him with all the claims from ex-clients that he (Bushby) could induce or procure to advance and press their claims. Whether this suspicion of Bushby was correct is not to the point, and no finding is made thereon; but I am convinced that this was Berkeley's motive, and it was in contravention of the statute.

From this it results that it was incumbent on Berkeley to show that, within the meaning of the bankruptcy statute he was solvent on April 21, 1910,

and on this point the finding of the master is against him. Some testimony has been taken since report filed, but even without that evidence I am of opinion, as matter of law, that Berkeley was worth more than $8,000 on April 21, 1910. He had at that time a note of Mr. George Gordon Battle's for $2,000 and a mortgage on property in Virginia for $3,000. Both of these securities were worth par, and the amounts thereof were subsequently collected.

It is true that when they were collected the proceeds thereof were put into the account of "Estate of S. M. Waugh, L. M. Berkeley, Administrator"; and it is admitted that this was done in order to prevent creditors from getting at said proceeds. This may be very wrong, but it is entirely beside the point. The fact that the proceeds were concealed some months after petition filed is no proof that the securities themselves were not in the possession of and assets of Berkeley on April 21, 1910.

At or before petition filed Berkeley was also the owner of a $6,000 mortgage on property shown to be worth more than that amount and situated on Longwood avenue, in this city. This mortgage had been in existence for some years, and had vested in Berkeley by the conveyance to him of Bushby's interest, which had been joint with Berkeley's. While Berkeley owned this mortgage, he received conveyance of the fee from one Baldwin, who held the same. The conveyance of Baldwin to Berkeley is subject to this $6,000 mortgage, and two days later Berkeley conveyed the fee to his father, subject to the same mortgage. In this transaction, put through nearly two years before petition filed, the master finds such lack of "absolute good faith" that "the ruse should not succeed." The force of this reasoning is not perceived; a deed carries no more than it purports to, and merger of title is a question of intent. So far as intent is concerned, if, in June, 1908, Berkeley was intending to conceal his property in the name of his nonresident father, it would certainly have been more appropriate to use words which confirmed instead of prevented merger, and not to leave on the record the title to a $6,000 mortgage outstanding in himself.

Documents, however, are produced showing that Berkeley, before taking Baldwin's deed, assigned the mortgage to a friend, and after conveying the fee to his father took a reassignment of the mortgage. Such a proceeding as this is entirely consistent with the language of the deeds by Baldwin to Berkeley and Berkeley to his father. The assignment and reassignment, however, are attacked as having been concocted long after the actual conveyance, and to be in effect forgeries. On this vital point the master expresses no opinion. He apparently assumes that the attacked documents are valid, but sweeps them away with the proposition that the whole apparatus of papers "wrought no actual change of title." If they wrought no actual change of title, then the title remained in the alleged bankrupt. Decision here, however, is rested, first, on the proposition of law that there was no merger of mortgage in fee, and, second, on the finding of fact that the evidence regarding the falsity or forgery of assignment and reassignment of mortgage is not convincing.

It results that on April 21, 1910, Berkeley was worth, exclusive of property conveyed in fraud of creditors:

| | |
|---|---|
| The Battle note | $2,000 |
| The Minor Virginia mortgage | 3,000 |
| The Longwood avenue mortgage | 6,000 |
| Moneys deposited with the chamberlain of New York, alleged to be his in the petition | 1,000 |
| Total | $12,000 |

Therefore he was solvent without any reference to fraudulently transferred property, so far as all the provable debts shown in this proceeding are concerned.

[2] There is one other matter in this record which demands attention. The first page of a volume of testimony amounting to 714 pages contains a stipulation that "the fees of the special master herein be increased from the rate allowed by law to the rate of $10 per hour or fraction thereof devoted by him

on any day to the taking of testimony and preparing his report herein." It does not appear whether the special master availed himself, or sought to avail himself, of this stipulation. It is therefore only noted that such a stipulation as this is in violation of the rules of this court and those of equity practice. A master is entitled to $5 a day for his services, or to such extra or additional compensation as the court may award. It is probably not within the power of the court to prevent the voluntary payment of additional compensation. It is within the province of the court to mark the receipt of such additional compensation, without the sanction of the court, as something wrong. These statements are made after consultation with the other Judges of this court. The almost inevitable result of an agreement such as this is shown in the diffuse and ill-regulated proceedings contained in the volume of evidence submitted.

It would ordinarily be a matter of course to dismiss this petition, with costs. In this case, however, costs and expenses have been piled up by both parties equally. Especially have many of defendant's refusals to answer been calculated to excite suspicion and protract the proceedings. As it is, the petition will be dismissed, without costs, and the order of dismissal will contain a proviso that the $5,000 produced in court by Berkeley on argument, and now deposited with the clerk of this court, be returned to him.

H. B. Singer, of New York City (Max D. Steuer, of New York City, of counsel), for appellant.

L. M. Berkeley, of New York City, pro se.

Before LACOMBE, COXE, and NOYES, Circuit Judges.

PER CURIAM. The District Judge has discussed at considerable length the various questions presented in this long record. We fully concur in his reasoning and conclusions.

The decree is affirmed.

---

REBER v. CONWAY.

(Circuit Court of Appeals, Third Circuit. February 18, 1913.)

No. 1,640.

LANDLORD AND TENANT (§ 157*)—FIXTURES—CONSTRUCTION OF LEASE—"DETACHED."

Where property which had been previously used as a large and modern livery stable was leased to be used as an ice cream factory requiring many structural changes in the building, so that, on the termination of the lease, the property would not be suitable for use again as a livery stable, a provision in the lease that all improvements or additions made by the lessee should not be detached from the property, but should remain for the benefit of the lessor, covered all machinery and other trade fixtures attached to the property by the lessee, and was not limited to mere structural changes in the building; the word "detached" being used as the antithesis of "attached" to cover property attached to the building, etc.

[Ed. Note.—For other cases, see Landlord and Tenant, Cent. Dig. §§ 571, 572, 574–607; Dec. Dig. § 157.*

For other definitions, see Words and Phrases, vol. 3, p. 2034.]

Appeal from the Circuit Court of the United States for the Eastern District of Pennsylvania; John B. McPherson, Judge.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep't Indexes