FEDERAL OIL MARKETING CORPORATION et al. v. CRAVENS.

No. 8969.

Circuit Court of Appeals, Eighth Circuit.

Feb. 2, 1931.

Conard E. Cooper, of Tulsa, Okl., for appellants.

J. D. Head, of Texarkana, Ark. (Fadjo Cravens, of Fort Smith, Ark., on the brief), for appellee.

Before KENYON and GARDNER, Circuit Judges, and MUNGER, District Judge.

## KENYON, Circuit Judge.

This is an appeal from a final order allowing appellee an attorney fee of $12,000 for services rendered N. T. Gilbert, ancillary receiver of Federal Oil Marketing Corporation (hereinafter referred to as Federal Company) in the intervention proceedings of Frank J. Oakes et al. in the United States District Court for the Western District of Arkansas. The intervention was dismissed eventually for want of prosecution.

The receivership proceedings in Arkansas were ancillary to the original receivership in the United States District Court for the Southern District of New York in the case of Phelan v. Middle States Oil Company, in which Julius M. Mayer and Joseph P. Tumulty were appointed receivers. After addition, upon proper amendment to the complaint, of other parties as defendants, including the Federal Company, ancillary jurisdiction was granted in the District Court of the United States for the Western District of Arkansas, and ancillary receivers were there appointed. N. T. Gilbert was one of them. At the same time C. E. Cooper and McGuire & Marshall were appointed as counsel for the ancillary receivers.

In October, 1924, appellee was appointed by Judge Youmans as local counsel for the ancillary receivers in the state of Arkansas. His services continued to November, 1926, when the properties were discharged from receivership. There were various proceedings in connection with the ancillary receivership, and considerable litigation. For his services as attorney in that receivership he was allowed by the court a fee of $25,000, which was recommended by Mr. Cooper, general counsel of the ancillary receiver, and Mr. Gilbert, then sole ancillary receiver. The controversy here is not as to this fee.

In March, 1927, Judge Youmans permitted Oakes et al. to file an intervention in the receivership proceedings in so far as they applied to the Federal Company. The intervention was on behalf, not only of these particular parties, but other unit holders, in what had been known as the Vitek Oil & Refining Company, and sought to set aside as fraudulent the transfer of the Vitek properties by Vitek to the Sure Oil Corporation, which in turn had conveyed the properties to the Federal Oil Marketing Corporation. The result of that suit, if successful, would have been to take practically all the properties from the Federal Oil Marketing Corporation and leave that company assetless.

In April, 1927, interveners filed an amended and substituted bill of complaint, making a large number of oil corporations parties defendant. The court entered an order, under section 57 of the Judicial Code (28 USCA § 118), directing the nonresident defendants and their receivers to plead, answer, or demur to the said amended bill.

On April 23, 1927, the court upon motion of interveners reappointed N. T. Gilbert ancillary receiver of the properties and assets of the Federal Company, and continued in force all orders and decrees with reference to the employment of counsel for the ancillary receiver. Cravens continued as counsel, acting with C. E. Cooper and the law firm of McGuire & Marshall. James D. Head of Texarkana was employed as counsel to represent nonresident defendants. Cravens served as counsel until an appeal in the Oakes-Vitek case was taken to this court from an order of Judge Youmans dismissing on July 2, 1929, the same for want of prosecution. The period covering the service for which the fee of $12,000 was allowed was from April, 1927, to July, 1929. It required some five hundred pages of record in the Vitek appeal to set out all the proceedings connected with the intervention. We reviewed the long history

of the litigation in Oakes et al. v. Federal Oil Marketing Corporation et al. (C. C. A.) 42 F.(2d) 991, and affirmed the trial court's decree without prejudice to appellants' right to bring an independent action.

 Appellee had no contract as to the amount of compensation he was to receive—hence the rule applies that he would be entitled to reasonable compensation for services rendered. In determining reasonable compensation there is to be considered the character, ability and experience of the attorney, the amount involved, the time necessary to prepare for trial, the difficulty and intricacy of legal propositions to be determined, the results attained, what is charged by attorneys of equal standing and ability in similar litigation, whether the counsel had the real responsibility for the case, or was acting merely as local or co-counsel. See Tracy v. Spitzer-Rorick Trust & Savings Bank (C. C. A.) 12 F.(2d) 755; Stanton et al. v. Embry, Administrator, 93 U. S. 548, 23 L. Ed. 983; Forrester et al. v. Boston & M. Consol. Copper & Silver Min. Co. of Montana, 29 Mont. 397, 74 P. 1088, 76 P. 211; Clark v. Ellsworth, 104 Iowa, 442, 73 N. W. 1023; 2 R. C. L., p. 1059, § 145.

The hearing on the application for attorney fees was before Judge Martineau. The proceedings in the Oakes-Vitek intervention matters had been before Judge Youmans, but on account of illness he was unable to hear the application for attorney fees. Evidence was introduced at the hearing of lawyers of ability and high standing at the bar that appellee's services were of the value of ten to fifteen thousand dollars—one put the minimum at $15,000. All testify to substantially the same value. The trial court filed an opinion reviewing the services performed by Cravens and Head, as shown by the evidence. It allowed Cravens a fee of $12,000, and recommended to the District Court of the Southern District of New York the allowance of a fee of $15,000 for Head. We have nothing to do with this recommendation, and discuss Judge Head's services only as they may bear upon the question of Mr. Cravens' services.

 Appellants contend that the fee allowed is unreasonable, excessive, and unjust. Ordinarily the allowance of attorney fees in a matter of this character rests in the sound discretion of the trial judge of the court where the service is performed. Tracy v. Spitzer-Rorick Trust & Savings Bank (C. C. A.) 12 F.(2d) 755. Such court is better able to pass on the question than any other court, it is more familiar with the controversy in all its phases, and there is some presumption to be indulged in favor of the correctness of its finding. Here Judge Martineau had no more advantage than this court has, except of seeing and hearing the witnesses, but that is unimportant, as there is no particular question of veracity involved. He tried the case on the evidence as presented. That evidence is before us, and we think under the circumstances there is no presumption in favor of his order. A number of lawyers testified as experts as to the value of appellee's services. All federal courts have become more or less expert as to the value of the services of receivers and attorneys in receivership cases. A judge of a trial or appellate court is not bound by the opinion of experts as to attorney fees. He is an expert himself, and knows as well as a legal expert what are reasonable attorney fees. This court has as much knowledge of the legal work done in the Oakes-Vitek intervention as the expert witnesses had.

 It is not a pleasant duty to hold that attorney fees allowed by a trial court are excessive, especially in the case of attorneys of high character and ability, as it is without question Mr. Cravens and Mr. Head were. But on the other hand, appellate courts should not hesitate in their duty of protecting trust estates from excessive receivership and attorney fees. "Vicarious generosity," as expressed by the Supreme Court in In re Gilbert, 276 U. S. 294, 48 S. Ct. 309, 72 L. Ed. 580, has been manifested by many courts in the allowance of extravagant fees in this class of cases.

Applying the general tests as to reasonable compensation for attorneys, what do we find?

 There is no question as to the high character, standing, and ability of appellee, or that the work which he did as an attorney was well done and satisfactory to his client. There is controversy as to the extent and character of such legal service. While Mr. Cravens did a large amount of service in the proceedings up to the time of the Oakes-Vitek intervention, for which he received a most liberal fee of $25,000, it is without question, and freely conceded by appellee, that after that time the greater part of the legal work was done by Mr. Cooper, general counsel, who seems to have been a specialist in receivership cases. Mr. Cravens acted merely as a local attorney. Mr. Cooper had the entire burden and responsibility of the litigation. He prepared all the briefs and the pleadings,

except he received some assistance from Judge Head in preparing the answer. Substantially every document used in the case, and they were many, was prepared by Mr. Cooper. He assumed all the direction as to procedure, with advice now and then from appellee and Mr. Head. He made all the arguments to the court on the various legal questions and motions. Mr. Cravens secured a number of orders for extension of time, and examined the extensive briefs prepared by Mr. Cooper. Examination by co-counsel of briefs prepared by the main counsel is not comparable of course with the labor of preparing them. Cravens made suggestions at times, and once or twice cited some authorities to Cooper, but the entire record shows that Cooper was doing the real legal work and that Cravens was acting merely as local attorney. Mr. Cravens testified: "I did not prepare any pleadings or briefs in this case. I have, however, at Mr. Cooper's request, examined pleadings and briefs prepared by him. Mr. Cooper has taken the lead in this case all the way through. He had made the principal arguments at the various hearings. In other words, he has taken the lead in presenting all matters, I only consider myself an associate counsel." Cravens in his testimony claims that he was advised by Cooper that when the litigation was concluded, he and the ancillary receiver would recommend the allowance of a substantial fee. He testifies that he was in constant communication by letters and telegrams with Cooper concerning the litigation, and that these letters and telegrams totaled approximately five hundred in number, and that "practically each one required attention on my part and much time"; that he examined some six hundred typewritten pages of pleadings and briefs prepared by Mr. Cooper, and that he was requested to familiarize himself with the pleadings and become conversant with the law so that he could present and argue different questions raised in the case (the record is silent as to his ever having argued any of these questions); that he spent approximately thirty days in court attending different hearings; and that during the pending of the litigation one-fifth of his time was devoted to it. His counsel claim in their brief that during the intervention he devoted at least seven full months of his time to it. On cross-examination he testified that he did not keep a record of his time, but that there was hardly a week in the three years during which the litigation was pending that he was not called upon to do something. We quote from his cross-examination by Mr. Cooper, which indicates apparently exactly the kind of work he was doing:

"Q. What would be the nature of those requests that would require so much time? A. Well, they were requests made by you to file certain papers or get certain settings, get certain extensions, or get certain agreements, things of that nature, which are as well within your knowledge as within mine.

"Q. If there would be an occasion for an extension you would go over and ask Judge Youmans if he would grant the extension? A. Yes.

"Q. Did I ever apply for many extensions? A. I don't recall, I don't know that there were many. I recall a few.

"Q. In what instances? A. One instance was an extension of time in which the defendant was allowed to take testimony by depositions.

"Q. The defendants? A. Yes, sir. The time was originally given to the plaintiff to take testimony from a certain time. Then that time was by agreement extended and Judge Youmans required a stipulation. I had to come to see him at your request about that. I think he required a stipulation should be filed and then that your time should be extended the same length."

We have gone over the letters and telegrams from Cravens to Cooper and from Cooper to Cravens introduced as evidence. There are 171 of them in the record, which purported to be all the correspondence between them. Most of these letters are very short. They acknowledge receipt of motions or pleadings sent by Cooper. Few of them are more than one page in length. Only two of them cite authorities. A number of them relate to fees. Some of them congratulate Cooper on his court efforts. One cites some Arkansas cases on laches. A number refer to securing date for trial of case. Few of these letters required much thought or any particular time.

As to the hearings, the record shows that on various matters arising in settling the issues and leading up to the supposed time of trial there were approximately eighteen hearings. Nine were held at Fort Smith, which is Mr. Cravens' home, which were attended by him; seven were held at Texarkana, and two at El Dorado. Mr. Cravens also spent several days in Tulsa with Mr. Cooper in preparing for trial. We do not possibly see how Cravens could have spent thirty days in attendance upon hearings. The hearings at Fort Smith would take less of his time than where he was compelled to attend at Tex-

arkana or El Dorado. We think he is mistaken as to the amount of time spent in attending hearings.

Mr. Gilbert, ancillary receiver, who had recommended the large fees in the first receivership of $25,000 to Cravens, $24,125 to Cooper, and $24,125 to McGuire & Marshall, and who received $48,250 for his services as receiver, testified:

"I have followed the Oakes intervention from the very beginning, and I think only in one instance have I missed attending a hearing, and on that occasion I had to be in Chicago. I have followed the case very carefully, have read the briefs, and examined correspondence between Mr. Cooper and the New York office and between Mr. Cooper and Mr. Head, and between Mr. Cooper and Mr. Cravens. I believe I am more familiar with the services rendered by the various counsel in connection with this case than anyone else. I have no hesitancy in saying that Mr. Cooper has prepared practically all of the pleadings, the briefs and all other documents in connection with this case, and conducted the litigation; that in practically all instances Mr. Cooper has been followed in those by Mr. Cravens and Mr. Head. In very few instances, if any, have Mr. Head and/or Mr. Cravens offered any suggestions or correction that changed in any way the strategy or outline of policy that Mr. Cooper suggested. I would say that the work Mr. Cooper has done in connection with this case has been many times as much as both Mr. Head and Mr. Cravens have done. * * *

"Cross-Examination by Mr. Head:

"Before Mr. Cooper made any arrangement with reference to employment of Mr. Head, he talked it over with me. I was not a receiver under the New York jurisdiction.

"It was my impression that not only Mr. Head's fee would be nominal, but his activity would also be nominal.

"Q. Just a yes man? A. Yes, sir, that is right. Mr. Cooper was perhaps bound by theoretical reasons, he wouldn't represent all the companies. I am quite sure that if that had not been the case you nor anyone else would have been employed.

"Q. I just asked you if your idea is that I was just to be a yes man? A. I don't know what you mean by that, Judge. I don't want to be unkind. My theory of your employment in this case was that you would represent those companies that Mr. Cooper could not represent, but work under his direction.

"Q. Was I to do any work? A. Not very much.

"Q. Didn't do any, did I? A. I don't think you have done much work in this case."

It appears from the evidence of Mr. Gilbert also that the Vitek properties in question were not worth the sum of $429,000, which some of the witnesses estimated. He states the value of the properties acquired from Vitek as of February 1, 1927, show a total of $429,000, but in that is the Miller-Wingfield lease valued at $210,000, which prior to the receivership had expired, and was not the property of the Federal Oil Marketing Corporation at the time the receivers were appointed. Hence the amount involved in the Oakes-Vitek intervention was really $219,000 instead of $429,000. Mr. Cooper for the work done in the Vitek case received $4,500. He was receiving $28,000 a year in the various receiverships, and the $4,500 was an allocation against the Federal Company of the proportion it should bear of his salary because of his services in the Oakes-Vitek case. Cravens did no work on the appeal of the case to this court and did not appear here as counsel. There is no doubt whatever that Mr. Cooper did a great deal more work than both Mr. Cravens and Mr. Head together. Mr. Gilbert testifies, "many times as much as both * * * have done." The fees for Mr. Head and Mr. Cravens would amount to $27,000 if allowed as suggested by the court. If Mr. Cooper had received the same award as Mr. Head the total fees would have been in the neighborhood of $42,000 for attending to a case in a trial court in which there never was a decision on the merits, but which was dismissed for want of prosecution, and in which case the amount involved was approximately $219,000. If Cooper had received as much as Cravens and Head together were claiming, which on account of the superior character of services rendered by him he would be entitled to receive, the total fees would have been $54,000. The mere statement of such a proposition would be shocking to the average legal conscience, and the allowance of such fees would be a reproach to courts and to the legal profession. Certainly no attorneys would charge a private individual any such fees.

A situation is here presented of where the leading lawyer, Mr. Cooper, who carried the burden of the litigation, doing practically all the hard work in the case, received $4,500 for his services, while his co-counsel who carried none of the brunt of the hard, grinding work of preparing for a lawsuit, would receive, if the court's recommendation and allowance were carried out, $27,000. The $12,000 fee allowed appellee is more than the

salary of a United States District Judge for an entire year. It is more than the salary of the most of the Governors or Judges of the Supreme Courts in the respective states of this country. In our judgment it is so exorbitant that its allowance must be held to be an abuse of the court's discretion. That there has grown up a judicial abuse in the allowance of excessive fees to masters, receivers, and attorneys in receivership cases cannot well be denied. The Supreme Court of the United States has called attention to this and sounded a note of caution and warning to the judges of the federal courts in the case of In re Gilbert, 276 U. S. 294, 296, 48 S. Ct. 309, 310, 72 L. Ed. 580, as follows: "We were desirous of making it clear by our action that the judges of the courts, in fixing allowances for services to court officers, should be most careful, and that vicarious generosity in such a matter could receive no countenance." And in Newton v. Consolidated Gas Co., 259 U. S. 101, 42 S. Ct. 438, 439, 66 L. Ed. 844, in passing on the compensation of a master the Supreme Court points out that, "The rights of those who ultimately pay must be carefully protected." There seems to have developed an idea that lawyers are entitled to more compensation when employed in a receivership case than they would think of charging if employed by a private client for similar services. There is no reason for any difference in charges. Counsel should be allowed fair and reasonable compensation in receivership matters. There is no reason why they should be overpaid.

We call attention to a few of the cases where excessive fees have been condemned.

In Trustees of Internal Improv. Fund v. Greenough, 105 U. S. 527, 536, 26 L. Ed. 1157, the Supreme Court of the United States called attention to the practice of allowing to trustees, receivers, and counsel extravagant fees and commissions, and said: "Sometimes, no doubt, these allowances have been excessive, and perhaps illegal; and we would be very far from expressing our approval of such large allowances to trustees, receivers, and counsel as have sometimes been made, and which have justly excited severe criticism." In his dissent in the case Justice Miller said, "I do not agree to the opinion, so far as it is an argument in favor of a principle on which is founded the grossest judicial abuse of the present day; namely, the absorption of a property or a fund which comes into the control of a court, by making allowances for attorneys' fees and other expenses, pending the litigation, payable out of the common fund, when it may be finally

decided that the party who employed the attorney, or incurred the costs, never had any interest in the property or fund in litigation." Page 538 of 105 U. S., 26 L. Ed. 1157.

In Central Railroad & Bkg. Co. v. Pettus, 113 U. S. 116, 5 S. Ct. 387, 28 L. Ed. 915 the court held that the amount allowed as attorney fees was twice what it should be and reduced it one-half.

In Mecartney v. Guardian Trust Co., 280 F. 64, this court had before it the question of attorney fees where claimant was asking for $75,000 for legal services rendered by him and his associate counsel, in a case formerly pending in this court. Eminent counsel testified that the services were worth from $75,000 to $200,000. This court allowed $37,500, which was one-half of the lowest estimate of any of claimant's witnesses.

In Union Trust & Savings Bank v. Hamilton (C. C. A.) 283 F. 56, the court held that an allowance of $18,000 for attorneys of receivers of a railroad covering a period of six years, during which the railroad was sold for $400,000, was not excessive. This would be at the rate of $3,000 per year. Mr. Cravens claims here that he spent in the litigation seven months of time. At the same ratio that was allowed in this case of $3,000 for a year, a reasonable fee for Mr. Cravens would not exceed $2,000.

In Brown v. Pennsylvania R. Co. (C. C. A.) 250 F. 513, the master was allowed $20,000 and the attorneys $200,000. The appellate court cut the master's fee in two and made the same suggestion in reversing the decree as to counsel fees.

In Walton N. Moore Dry Goods Co. v. Lieurance (C. C. A.) 38 F.(2d) 186, 191, 192, the court referred with approval to the principle set forth by the Supreme Court of Montana in Hickey v. Parrot Silver & Copper Co., 32 Mont. 143, 79 P. 698, 108 Am. St. Rep. 510, with reference to the compensation of a receiver, where the Montana court used this language: "It is well established that the compensation allowed a receiver must be reasonable, but why compensation must be greater, in order to be reasonable, for doing certain work, when the hiring is done by the court, than it would be for the same duties if the hiring were done by an individual, is not apparent." And the Montana court says these remarks apply equally to allowances for counsel fees. We agree with that statement.

The large fee allowed Mr. Cravens in the first receivership cannot be used as a rule to measure the attorney fee in the second re-

ceivership. There is no comparison as to services performed. We have not reviewed here the entire evidence, but we have carefully studied it, and can reach no other conclusion than that any fee for Mr. Cravens' services in excess of $2,500 would be excessive. The order of the trial court is therefore set aside, and the case is remanded for the allowance of a fee to Mr. Cravens of not to exceed $2,500.

Reversed and remanded.