## UNIVERSAL OIL PRODUCTS CO. v. HALL.*

## STANDARD OIL CO. (INDIANA) v. SAME.

### Nos. 10087, 10088.

Circuit Court of Appeals, Eighth Circuit.

March 9, 1935.

*Rehearing denied June 17, 1935.

Charles H. Mayer, of St. Joseph, Mo. (R. R. Brewster, of Kansas City, Mo., and A. F. Reichmann, of Chicago, Ill., on the brief), for appellants.

J. M. Johnson, of Kansas City, Mo. (M. J. Fulton, of Richmond, Va., and D. W. Johnson, of Kansas City, Mo., on the brief), for appellee.

Before WOODROUGH, Circuit Judge, and FARIS and DONOHOE, District Judges.

WOODROUGH, Circuit Judge.

On appeal from an order allowing additional compensation to Holmes Hall, special master in chancery.

On November 25, 1921, Holmes Hall, an attorney at law practicing in Sedalia, Mo., and earning not to exceed $5,000 a year, was appointed master in chancery in a patent infringement suit in equity brought by the Universal Oil Products Company against the Standard Oil Company, with power and directions to hear testimony and make and report findings of fact and conclusions of law to the court. The trial court did not make the appointment of Mr. Hall entirely of its own motion. Mr. Hall had learned of the likelihood of an appointment being made, and had called upon the chief patent attorney for the plaintiff in the case and upon the chief patent attorney for the defendant Standard Oil Company, in Chicago, soliciting their agreement to his appointment as master, and he had also told the District Judge that he believed the attorneys representing the litigants would agree upon him as master. After his appointment, and on the day before the taking of testimony began in Santa Barbara, Cal., Mr. Hall presented to the attorneys in the case a written stipulation for them to sign fixing his compensation for the services he was to perform as master in chancery at $150 per day. He had asked for $250 per day. The attorneys, faced by the fact that Hall had already received his appointment as master, signed a stipulation on behalf of their clients agreeing that Hall should receive as compensation for his services as special master a per diem of $100 per day for all the time spent by him away from his home at Sedalia, Mo., in connection with the case and for all of the time which he should devote to the cause while at his home and while making and filing his report, and that, in addition to such compensation, the special master would be reimbursed for all hotel bills, travel, and incidental expenses incurred by him while away from his said home and while attending to his duties as such special master; that the per diem and expenses should be paid one-half by the plaintiff and one-half by the defendant and taxed as costs in the case. The stipulation also contained the clause that the master should receive as compensation "any additional sum that may be allowed by the court." The stipulation so exacted by the master was presented to the District Court Judge and approved by him.

Between the date of his appointment and October 18, 1924, the master heard testimony in the case at different times and in different places during many days; the record not disclosing exactly on what days the testimony was taken.

It is clear that from the beginning of his service the master did not comport himself with the dignity and reserve proper to the office of master in chancery. Attorneys in the case testified, one, that he heard from many sources that the master was talking to Tom, Dick, and Harry everywhere, and another, that he complained of the very unjudicial talk Mr. Hall was indulging in, and Mr. Hall himself testified: "I will have to admit, the condition I was in, I was like they said about the parrot that talked too damn much, I just simply did, no question about it."

But in the spring of 1924 one Cale Jones, who for years had been a court reporter in Kansas City, informed one of the attorneys for the defendant that the master had been talking to him (Jones) about the case and

was not fair and impartial, and was not going to decide the case upon its merits, but, if possible, would force a settlement from the defendant, and had proposed to Jones that he should attempt to bring about a settlement of the case and had agreed to pay him $25,000 out of his own pocket if, as a result, the master got a fee of $250,000 or $300,000, and $10,000 if he brought about any settlement. The fact was, as afterwards admitted by the master, that the master had gotten the idea that, if the case could be brought to a settlement, he could get a master's fee of $250,000 or $300,000. His own language is: "I know that ($250,000.00 or $300,000.00) is the only figure I had in mind in the event the case would be compromised." The fact is further, as admitted by Mr. Hall, that he talked about the case a great deal with Cale Jones, and particularly that he "wanted to help Jones settle the case and I (Mr. Hall) offered to help him in advising him how to talk to Mr. German and to Mr. Brewster (attorneys for the litigants)." "In other words, in talking to plaintiff I would paint the rosy side of defendant's case and vice versa." "I thought it was perfectly proper to advise Jones while I was Master that the thing for him to do was to paint as black a picture of the defense side to the defendant and to the plaintiff's side to the plaintiff." "I pointed out certain weaknesses which the plaintiff claimed were in the position taken by the defense." To help Jones further, the master dictated to Jones the different contentions urged by the respective sides.

The admissions made by Mr. Hall leave no doubt that prior to August 7, 1924, Mr. Hall was attempting to bring pressure upon the Standard Oil Company, through Cale Jones, to make some settlement of the case that would enable Mr. Hall, as he thought, to get a great fee.

Cale Jones was asked to go to a conference of the several attorneys for the Standard Oil Company, and he there repeated his disclosure concerning the conduct of the master to all of the attorneys present. In order to get tangible evidence as to whether what Cale Jones had reported was true, Cale Jones, assisted by one of the attorneys for the Standard Oil Company, prepared and mailed a letter from Cale Jones to Mr. Hall, which was calculated and designed to give Mr. Hall an opportunity, by answering in writing, to confirm the truth of what Cale Jones had reported, or to disprove it. Jones wrote that he had been asked to go to Chicago to confer with the chief counsel for the Standard Oil Company about a settlement of the case, and that he was sure that, if he could go and tell freely of the talks he had had about the case with Mr. Hall, it would have great weight. He wrote that by convincing the defendant that it was practically sure to get an adverse report he was satisfied he could bring about a speedy settlement and one that would be satisfactory. "Naturally," the letter continued, "I want to know where I come in. At first you told me you would give me $25,000 out of what you received provided I could effect a settlement, but later you have said several times $10,000." It was stated further in the letter: "The string to play is that I am sure, from talking with you, that you have been very much impressed with the plaintiff's case, and that I am sure you feel just the opposite toward defendant's case, and that I think the defendant has not a chance. * * * Let me know how you feel about this."

If Mr. Hall had not, in fact, plotted with Jones to deceive and intimidate the Standard Oil Company into making a settlement, and if he had not in fact offered to give Jones money to accomplish that result, and if he had not in fact talked to Jones about the testimony in the case and the witnesses and his impressions, and if he had not in fact the motives and purposes Jones attributed to him, then the letter would have been an insult and an affront which would have been resented. Mr. Hall did not resent it. On the contrary, he answered promptly:

"Dear Mr. Jones: Your letter written at Topeka August 7th was duly received and contents noted. * * *

"I will frankly admit that I would be glad to see a settlement of this suit, for it would save me the responsibility and great amount of work in going through this enormous record, which will probably run to 20,000 pages, exclusive of exhibits. And I probably would receive as much if not more compensation in case of a settlement. And it was while discussing with you the possibility of my getting a final fee of a certain size allowed me that I told you that if you brought about a settlement whereby I would receive such a final fee that I could afford to pay you $25,000, and that I could afford to pay you $10,000 if you brought about any kind of a settlement. For, if the case should be settled without my having to write a report, I would not only be saved the enormous amount of work which would be nec-

essary in making a report, but I could thereafter consistently, and with full propriety, act as attorney for any oil companies who might want to employ me; while if the case goes to a finish, I could not with propriety act as attorney for the winner, even after the case is finally determined, but the losing side would not want to employ me. And nearly all of the oil companies in this field are interested, either directly or indirectly in the result of this case. So, if the case is not settled, but goes to a decision, I will then have spent over three years of my life learning the oil refinery business and cannot with propriety reap any advantage of the knowledge thus gained. So for that reason I can afford and will be willing to add my little mite to what the parties to the suit will pay you for negotiating a settlement, and I believe, from what you and Mr. Brewster have told me, that you have made some progress."

The letter is, altogether, more than three printed pages long and concludes:

"Of course I would not want to be quoted about anything I have said in confidence to you (or to anyone else) about this case or about any other subject matter, unless I specifically authorized you to do so, and in such case, I would tell you just what I expected you to repeat and if it were about a subject as important as this case, I would dictate it to you so that you could quote me exactly as I told it. And I have some things in mind now which I could with full propriety say to you and which might be of some use to you. So be sure and let me know a few days in advance when you will be back here so that I will be sure and be here, as I may be able to make some suggestions that will be of some benefit to you, especially in regard to compensation, as I know you have no idea of trying to bring about a settlement purely as a matter of accommodation. It is very possible that we will adjourn by the 23rd or a few days late, and if you can get away, it may be well for you to get here by the 23rd."

After writing the letter above quoted to Mr. Jones on August 10, 1924, concluding, "If you can get away, it may be well for you to get here by the 23rd," Mr. Hall wrote another letter to Mr. Jones on August 14, 1924, in line with the same matter, which concluded:

"I hope you will get back here as soon as you can, and while it is estimated that the cross-examination of Dr. Paulus will be concluded some time next week, not later than the 23rd, I hope you will get here by that time at the very latest. And while I am sure they will understand each other as to your compensation, and will make terms entirely satisfactory to you, yet I will add that if you get here by the 23rd I will personally guarantee your expenses.

"Yours very truly,

"[Signed]   Holmes Hall.

"P. S.   Wire me when you will get here. H. H."

The patent infringement suit between the Universal Oil Products Company and the Standard Oil Company involved the validity and extent of the so-called Dubbs and Burton process patents having to do with dehydrating and cracking oil. After hearing the expert witnesses in the case, and so learning something about such matters, Mr. Hall, while acting as master, claimed to have invented a cracking process of his own. And he went so far as to have a drawing made of it and to have a patent attorney prepare a patent application. Mr. Hall says: "It was really an improvement upon the cracking process. It was nearer like the Humphreys run-back Standard Oil process than anything. I think it could have been used in the Dubbs process." Mr. Hall says he made disclosure of his patent to Thompson, the reporter, so that, if he should file the patent application, he could show that he had made disclosure. In other words, Mr. Hall, while master, was using the information he got from witnesses to work out some process in the field of invention covered by the lawsuit which it was his function to pass upon.

Upon receiving the correspondence between Mr. Hall and Cale Jones the attorneys for the Standard Oil Company prepared a motion for the removal of Mr. Hall as master on the ground of misconduct, setting up the correspondence and attendant circumstances, and Mr. Hall's action in regard to the patent oil cracking process. They also informed counsel for the plaintiff in the suit that they had serious charges to make against Mr. Hall. Counsel for the plaintiff were incredulous about any misconduct on the part of Mr. Hall, and, before they saw the documentary evidence, they rushed to his defense. There is no hint that they had any reason to consider Mr. Hall favorable to their side of the case or to them, but they resisted attack upon him by their adversary and protested against the master's being removed at the instance of the Standard Oil Company.

The correspondence of the master with Cale Jones was later exhibited to counsel for the plaintiff in the case. On reading it, Mr. German, of counsel for the plaintiff, said he was shocked and appalled. He testified that "I realized that, if the Master had agreed to pay Jones $25,000 if he could effect a settlement whereby Hall could get $250,000 that it was an appalling thing and I so expressed myself in pretty forcible language, if I remember, and I still feel the same way about it." Mr. Reichmann, one of the attorneys for the plaintiff, told Mr. Hall:

"This was a very deplorable situation and very injurious to all of the parties concerned and I felt it was his duty 'if he had any way to justify his conduct or to extenuate what was charged against him, that he should go before Judge Van Valkenburgh with the facts, and that, if he had any defense it was his duty to assist in the preparation of the defense against his removal.' * * * I said to my associates, including Senator Reed, that 'what has been disclosed was bad enough, that if a man charged with such a serious offense as that would not come forward and justify himself before the Court', that I thought he ought to be removed."

United States Senator Roscoe Patterson, who was known to have a friendly feeling towards Mr. Hall, was shown the correspondence, and when he had read it through he said: "This is perfectly horrible and I am going to see Hall and get his resignation." He further said that, if counsel would not file their petition, he would guarantee to have Mr. Hall's resignation by 2 o'clock.

A short postponement was had, and then counsel for the litigants on both sides appeared before the District Judge, together with Senator Patterson, to whom Mr. Hall had promptly given his letter of resignation. There was colloquy, in the course of which the court said that "the correspondence itself showed such a state of mind on the part of the Master that no report he could make could conceivably be of any value to the Court." He also stated: "And besides * * * this man has admittedly made an invention in this field. * * * Of course, that utterly disqualifies him and renders him entirely unfit to perform any quasi judicial function." The formal petition for the removal of the master was not filed. But the court made an order based on the agreement of the litigants in the form of a modification of the original appointment of the master. The power and direction to the master to make findings of fact and conclusions of law were eliminated and expunged from his order of appointment, as well as the direction to make master's report. It was further ordered that "as to all testimony heretofore taken and as to all testimony hereafter taken it shall be considered that all of such testimony has been and will be taken by Holmes Hall, Esq., as Examiner and certified by him as such."

After this alteration in his powers and duties had been made on October 18, 1924, Mr. Hall continued to sit at different times and places while stenographers took down the testimony of witnesses who gave testimony and produced exhibits in the case before him; such testimony being taken by him as examiner as provided in the amended order.

Mr. Hall was paid for the services performed by him under the terms of his order and amended order of appointment over and above his expenses the sum of $99,900; that is, at the rate of $100 per day for 999 days. Of the 999 days, 550 days were claimed to have been devoted to the taking of testimony and, of the remainder, 447 were claimed to have been devoted to a study of the record by Mr. Hall preparatory to returning the master's findings of fact and conclusions of law.

Thereafter the litigants effected a settlement of the matters in controversy between them and filed a stipulation for dismissal without costs, so that no return of the testimony taken was made.

In April of 1931, Mr. Hall filed in the cause an amended petition to be allowed additional compensation for services under the orders of November 25, 1921, and the modified order of October 18, 1924. He alleged in his petition that he had been paid by the parties to the suit for all of his per diems for all hearings held and for the necessary time spent in travel to and from the places where hearings were held and for the time spent by him in studying the record and the law, and that he has been reimbursed for all hotel bills, travel, and incidental expenses incurred by him while performing his duties; but he claimed that additional compensation was due him for his services, in that he was justly entitled to be paid for the time which was lost to him in holding himself in readiness to resume and hold hearings at such time as the counsel might find convenient and agreeable to them

and for the best interest of their respective clients, and he prayed allowance by the court for such additional compensation as will fully and fairly compensate him for his services, and that the litigants be ordered to pay the amount so found.

The litigants were granted leave to file and filed motions, respectively, moving the court to deny the petition of Mr. Hall for additional compensation and to take an accounting of all moneys paid to him by plaintiff and defendant respectively. It was alleged in the motions that Mr. Hall had been guilty of misconduct as a master, and on account of such misconduct had been removed by the court as master, and thereafter had performed services only as a commissioner or examiner; that, by reason of his misconduct and his disqualification as a master, he should be required to refund all moneys paid to him for alleged services for the study of the evidence taken in the cause and the study of the law therein and for any and all services alleged to have been performed preparatory to making a report in the said cause. The trial court made findings of fact and conclusions of law upon the requests of the parties, and allowed Mr. Hall additional compensation as prayed for by him in the sum of $12,000.

It is apparent from the findings made by the trial court and those refused that the court felt the litigants in the cause had paid out the great sums of money to Mr. Hall in accordance with the stipulation concerning master's fees which had been signed by their attorneys, and that the payments that had been made, outside of expense accounts, were the per diem payments contemplated in the stipulation. The stipulation was construed to contemplate the payment to Mr. Hall of additional compensation for loss of his time when he was not occupied, but awaiting the convenience of the parties. The allowance was made in contemplation of the stipulation for the amount of $2,000 per year for the period of 6 years.

We think the trial court erred in the construction it put upon the clause in the stipulation that the master should receive as compensation "any additional sum that may be allowed by the court." The plain intendment of this clause was that if, upon the performance of the services by Mr. Hall, it should appear to the court that the per diem specified in the stipulation was insufficient to fully compensate him for services rendered, then the court should, in its discretion, award an additional sum. But the stipulation was directed only to the performance of master in chancery services and provided compensation for such services only. The stipulation had nothing to do with, and was never intended to make provision for, compensation to Mr. Hall for mere inconvenience to Mr. Hall when he was idle or engaged in his other affairs and not performing master services in the case.

But the trial court should not have considered itself restrained or bound in any way by the stipulation which Mr. Hall had obtained from attorneys for the litigants after he was appointed master and had proceeded to Santa Barbara, Cal., to take testimony. It is the duty of the courts to fix the compensation of its masters in chancery upon view of the service performed, and not otherwise. The practice of masters approaching litigants' attorneys and bargaining with them for fees is not consistent with the proper administration of the office, and should not be sanctioned. In re Berkeley (C. C. A. 2) 203 F. 7; Ament v. Schubert Piano Co., 172 App. Div. 423, 158 N. Y. S. 532; Finance Committee v. Warren (C. C. A. 7) 82 F. 525; Fisher v. Fisher, 223 App. Div. 19, 227 N. Y. S. 345; Greenwood v. Marvin, 29 Hun (N. Y.) 99; Metropolitan Trust & Sav. Bank v. Perry, 194 Ill. App. 277; Polakow v. Leafgreen, 178 Ill. App. 566; Irwin v. Swinney (D. C. Mo.) 45 F.(2d) 890; Federal Oil Marketing Corporation v. Cravens (C. C. A. 8) 46 F.(2d) 938; Voron v. Chait, 101 Misc. 366, 167 N. Y. S. 657; Middleton v. Bankers' & Merchants' Tel. Co. (C. C.) 32 F. 524; Roxana Petroleum Corporation v. Colquitt (D. C.) 34 F.(2d) 470, 479.

So in this case, when Mr. Hall petitioned for allowance of fees, and the evidence was adduced and the litigants presented their claim that Mr. Hall had been guilty of misconduct and had been overpaid, it was the duty of the court to make stern and searching inquiry into the facts and to inform itself fully what the conduct of its officer had been, and, where satisfied of the guilt of its officer, no halfway measures should be considered, but the court officer must be held to strict accountability. Newton v. Consolidated Gas Co., 259 U. S. 101, 42 S. Ct. 438, 66 L. Ed. 844; Business Men's Assur. Co. v. Campbell (C. C. A. 8) 18 F. (2d) 223, 225; In re Gilbert, 276 U. S. 6, 48 S. Ct. 210, 72 L. Ed. 441; Kellner v. Schmidt, 237 Ill. App. 428, 435; Pleasants v. Southern Ry. Co. (C. C. A. 4) 93 F. 93.

Mr. Hall failed to comport himself with reserve and dignity, and he also disqualified himself as master by trying to get some patent privilege for himself in the patent field involved in the case before him. Both shortcomings were possibly attributable to inexperience and failure to appreciate the obligations of his office. But it is perfectly clear, on the whole evidence, that he betrayed his trust by attempting to deceive, intimidate, and coerce a wealthy litigant before him, with the corrupt motive of gaining for himself an enormous sum of money without earning it. The expressions used by his friend Senator Patterson, by his own witness, Mr. German, by the lawyer, Mr. Reichmann, who wanted to help him if there was any excuse for him, and by the trial court, when Mr. Hall's correspondence was laid before them, "an appalling thing," "deplorable situation," "a serious offense," "perfectly horrible," "the correspondence itself shows such a state of mind on the part of the Master that no report he could make could conceivably be of any value to the Court"—these expressions reflect the natural reaction of honest men to Mr. Hall's conduct, and there is no need to amplify.

, Mr. Hall's powers as master in chancery to make findings of fact and conclusions of law were withdrawn because of his misconduct. In consequence, and solely on account of that misconduct, great sums of money which had been paid to Mr. Hall on account of his alleged study of the testimony and the law, beginning almost immediately after the taking of testimony started, were utterly wasted and all advantage of the expenditures were lost to the litigants who paid the money. There is no possible ground upon which the court could be justified in permitting him to keep the money paid to him by the litigants for the wasted service.

■ It is accordingly the plain duty of the court to sustain the motions made by the litigants in the case for a rule upon Mr. Hall ordering and commanding him to restore the sum of $44,700 which was paid to him while he was master in chancery as compensation for his alleged study of the evidence and law in anticipation of making his Master's report.

The arguments and points made in the brief on Mr. Hall's behalf and orally at the bar of this court have been considered. Most of the brief is devoted to the tu quo que argument often presented in criminal cases. The idea is that the attorneys for the Standard Oil Company, having lost hope of winning their case because of insufficiency of their evidence and fearing the honest judgment of the master, entrapped him to get rid of him. But the plaintiff paid half of Mr. Hall's fees and is now praying to get back the part that went for Mr. Hall's study of the law and evidence, just as the Standard Oil Company does. Certainly the plaintiff had nothing to do with any entrapment. Neither did the attorneys for the Standard Oil Company. The letter which was written to Mr. Hall and signed by Cale Jones merely afforded an opportunity to Mr. Hall to reveal what was in his mind and heart, and he did so.

■ An argument is made for Mr. Hall that, "owing to the abnormal condition which was peculiar to this case (new in the annals of jurisprudence) the Master was made the servant of the parties and was compelled at their pleasure and convenience to lose" much time. The record so far bears out the contention as to satisfy that there was, on Mr. Hall's part, a complete misconception of the proper attitude and responsibility of a master in chancery appointed to hear testimony and report findings and conclusions. Such a master is a public servant engaged in a public function. He is an aide to the court of his appointment. He is not the servant of the litigants, nor the servant of their attorneys. He has a positive duty and must exercise firm discretion to cause the business confided to him to be brought to a conclusion within reasonable bounds of time. It is gross dereliction for him to seek to ingratiate himself with attorneys by blind indulgence or to sit supinely by while unconscionable delays defeat the ends of justice. Mr. Hall's claims are not strengthened by the argument. Street-Federal Equity Practice, § 1467, page 884; Kennedy v. Warren (Finance Committee v. Warren), 82 F. 525 (C. C. A. 7).

Equity Rule 62 (28 USCA § 723) provides, in part: "The master shall regulate all the proceedings in every hearing before him, upon every reference; * * * and generally to do all other acts, and direct all other inquiries and proceedings in the matters before him, which he may deem necessary and proper to the justice and merits thereof and the rights of the parties."

Equity Rule 60 (28 USCA § 723) provides, in part: " * * * And it shall be the duty of the master to proceed with all reasonable diligence in every such refer-

ence, and with the least practicable delay. * * *"

■ The court where the master was appointed and performed his service had power on its own motion, as well as upon the motions for rule filed by the litigants, to take accounting of the compensation which Mr. Hall had received, and to compel restoration of the amount lost and wasted by his misconduct. Newton v. Consolidated Gas Co., 259 U. S. 101, 42 S. Ct. 438, 66 L. Ed. 844.

■ Although ordinarily the fixing of masters' fees is left to the discretion of the trial court, this court does not shirk its own duty to prevent abuse of discretion and to preserve discipline among those officers of the court who act as arms of the court and hold in their hands pro hac vice the justice of the court. Newton v. Consolidated Gas Co., 259 U. S. 101, 42 S. Ct. 438, 66 L. Ed. 844; In re Gilbert, 276 U. S. 294, 48 S. Ct. 309, 72 L. Ed. 580; Merchants' & Mfrs.' Securities Co. v. Johnson (C. C. A. 8) 69 F.(2d) 940, 945.

The cause is reversed and remanded, with directions to the trial court to dismiss the petition of Mr. Hall for additional compensation at his costs and to issue its rule to Mr. Hall commanding Mr. Hall, within a short time fixed, to pay into court for the benefit of the litigants the sum of $44,700, with interest thereon from October 18, 1924, at the rate of 6 per cent. per annum.